THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* JOSEPH D. SUGARMAN, Appellant.

First Department, March 19, 1926.

Crimes — hypothecation by stockbroker of customer's securities in violation of Penal Law, § 956 — consent or assent by defendant to illegal hypothecation by cashier shown by course of defendant's business known and approved by him — certificate was indorsed by defendant and delivered to cashier without specific instructions — cashier in conformity with office practice hypothecated certificate — instructions not erroneous — " consent " and " assent " defined — evidence — books showing customer's account properly admitted — evidence showing that person who received certificate from owner was defendant's agent was proper — charge as to propriety of law not error — charge as to high duty of brokers not error.

In a prosecution for a violation of section 956 of the Penal Law which forbids a broker's hypothecating a customer's securities without the consent of the customer, and which declares that a broker is liable who consents to the hypothecation or assents thereto, the consent or assent of the defendant to the hypothecation of a certificate of stock delivered to him without authority to sell or hypothecate the same was shown by the evidence, since it appears that the course of business in the defendant's office was for the cashier to hypothecate securities delivered to him unless specifically instructed not to do so; that the defendant not only knew about the course of business in his office, but instructed the cashier as to the method, that the certificate of stock in question was indorsed by the defendant, personally, and delivered to the cashier without specific instructions not to hypothecate the same; and that the cashier in the regular course of his duties and for the purpose of raising money, delivered the certificate to a firm of brokers and used the money received from said brokers in defendant's business.

The court did not commit error in instructing the jury to the effect that the defendant was not required to have personal knowledge of each and every individual transaction in his office in order that he might be found guilty, and also in instructing the jury that if they found that error or mistake was made by the cashier in causing the stock to be hypothecated without the knowledge of the defendant they might acquit, for the two instructions are not mutually exclusive propositions.

The court properly defined " consent " as an active circumstance of concurrence and " assent " as a passive act of concurrence prior to the doing by another of the act charged as the crime.

It was not error to admit in evidence a page from defendant's ledger containing the account of defendant's firm with the owner of the certificate, since it was

14

shown that the page was from the defendant's ledger, and since it appears that the page showed the status of the owner's account and was kept in the handwriting of the cashier from the time of the receipt of the certificate. The page was properly received with the other books of the defendant which showed falsely that the stock was on hand, when, in fact, it had been pledged.

It was not error to admit in evidence a check for $100 and a slip attached to the check showing that its companion paper was a draft for money due to the person who received the certificate from the owner, since the object of the evidence was to show that the person who received the money was the agent of the defendant at the time he received the certificate.

While the court stressed the importance and the propriety of section 956 of the Penal Law, still there was nothing in the instruction to the jury more than a statement that they should not pass on the propriety of that law, but were required to enforce it.

It was not error for the court to state that brokers under the law are held to a high measure of honesty to their clients, for the instruction does not put too severe a test of fidelity on brokers.

APPEAL by the defendant, Joseph D. Sugarman, from a judgment of the Court of General Sessions of the Peace in and for the County of New York, rendered on the 2d day of May, 1924, convicting him of violation of section 956 of the Penal Law.

*Philip C. Samuels* of counsel [*Max Lazarus* with him on the brief], for the appellant.

*Joab H. Banton,* District Attorney [*Felix C. Benvenga,* Assistant District Attorney, of counsel; *Charles Henry,* Deputy Assistant District Attorney, with him on the brief], for the respondent.

McAVOY, J. Defendant was convicted in the Court of General Sessions of the County of New York on May 2, 1924, after trial, of a violation of section 956 of the Penal Law, which forbids without the consent of the owner the hypothecation of a customer's securities. This section 956 of the Penal Law under which defendant was convicted provides that a person engaged in the business of purchasing and selling as a broker, stocks, bonds or other evidences of debt of a corporation, etc., who has in his possession, for safekeeping or otherwise, such securities belonging to a customer, and upon which he has no lien nor any special property therein, and who pledges or disposes of such securities without the customer's consent, is guilty of a felony. The statute makes every member of a firm of brokers who either does, or consents or assents to the doing of, any act which is made a felony by that section of the Penal Law which has just been outlined, guilty of such felony.

The indictment was on three counts, one for larceny, one for embezzlement, and one for the hypothecation as a broker of a customer's securities, the general charge being that defendant

disposed of 100 shares of stock of the Texas Company, the property of the complainant Barringer, on the same day as he received it without having a lien thereon or any special property therein and without the consent of the customer, complainant; and the indictment further alleges that defendant consented and assented to the hypothecation. This was the count submitted to the jury. The other counts on common-law larceny and larceny by embezzlement were withdrawn from the jury.

The defendant Sugarman was a stockbroker who occupied an entire building in the conduct of his business. He had many employees engaged in the carrying on of the office work, including a manager, blotter clerk, bookkeepers, telegraph operators, cashiers, entry clerks, runners, messengers, telephone operators, etc. On November 16, 1921, there was received by mail a certificate of stock for 100 shares of the Texas Company which were owned by one Edward E. Barringer. At this period Sugarman & Co., defendant's firm, had an account with a firm known as Boyd, Halsted & Co., who were members of the New York Stock Exchange. They did the business of Sugarman & Co. on the floor of the Exchange.

The defendant had a room in the building which his firm occupied, where he directed the conduct of his office and carried on his duties as its head. Among these duties was the signing of his name on the reverse side of certificates of stock guaranteeing the indorsements thereon, so that they would be passed by delivery among stock brokerage houses in the financial district. While this was not necessary to make the certificates negotiable, a custom of the trade required this signature to authenticate the indorsement of the owner and thus assure the buyer or the pledgee that the signature of the owner was that of somebody whom the selling or pledging broker knew. The defendant was not always in his office. He frequently was required to travel about the State, calling upon various offices or firms engaged in the stock brokerage business. He had a manager, one Stewart, who performed the same duty of indorsing the certificates, and it depended upon the availability of either at any particular time who would carry out the duty of indorsement. From April, 1919, until January, 1922, Sugarman & Co. employed one Gelobter first as a blotter clerk and thereafter as a stock cashier. On the day of the transfer of this certificate he received in his cage this certificate of stock for 100 shares of the Texas Company, which Barringer owned, and which was indorsed by Barringer and by the defendant, and delivered it to Boyd, Halsted & Co., without specific instructions from defendant or any one else, on his own initiative.

Barringer, after November 16, 1921, conducted an account with Sugarman & Co. on margin, and in this account he was credited with this 100 shares of the Texas Company. It is this conduct of Gelobter in transferring the shares to Boyd, Halsted & Co. on the day he received them, which the People claim makes out a case within section 956 of the Penal Law, prohibiting the hypothecation of a customer's securities without his consent or assent.

Between November, 1921, and January, 1922, Barringer, the complainant, never saw the defendant nor spoke to him by telephone or otherwise. They first met in defendant's home on January 25, 1922, after defendant had gone into bankruptcy and a receiver had been appointed for defendant's firm; and during the period of the conduct of the account in defendant's office with Barringer there does not appear to be any direct proof that defendant had knowledge thereof.

The salient points establishing the guilt of defendant are summarized in these facts: After the stock was received in New York by Sugarman & Co., on that very day it was indorsed by defendant Sugarman in person and pledged for $4,600 to raise money for his own purposes, although Sugarman had no instructions from Barringer to make any transactions on his behalf and had given no orders for the purchase of stock or for the use of his collateral. At the time of the pledge Sugarman did not have or claim to have any lien on or special property in the pledged stock, so that the pledge was either an unwarranted act of the clerk, Gelobter, or else Sugarman, by the course of conduct of his business from the beginning, had expressly or impliedly feloniously procured it to be pledged. Barringer, the owner, never received it again. Sugarman shortly after this event went into bankruptcy. After the wrongful pledge of this stock the books of Sugarman & Co. purported to show that the firm had possession of this very stock, although admittedly these entries were false and fraudulent since they had not had possession after the day they received it.

Barringer interviewed the defendant after the failure, and defendant said he would look into the matter and send Barringer his stock, if he could find it, and told him to go home. Barringer lived in Salisbury, N. C. Mrs. Sugarman, defendant's wife, in making the appointment for the interview, told Barringer that she understood that they were going to give him back his stock. Neither defendant nor his wife denied this conversation, which would raise an implication of liability to complainant for the return of his certificate for the shares of stock.

The consent or assent necessary to the completion of the crime, it is contended by the defendant, is not shown by any evidence

in the record, because no knowledge specifically on the part of the defendant of the hypothecation of Barringer's stock certificate is in the proof, and it is further argued that no implication of defendant in the actual pledging thereof is found in the testimony.

The People showed that the certificate, which was hypothecated, was given by Barringer to Morris, an agent of defendant; and that it was transmitted by Morris to defendant Sugarman. Sugarman indorsed it himself, although it was already indorsed in blank by the owner. The only legitimate reason requiring defendant's indorsement was the purpose of selling the certificate. Sugarman had no lien upon it. His indorsement gave some proof of intention to dispose of the certificate forthwith, because the owner at that time had not incurred any obligation for stock transactions. The indorsement was sufficient to warrant the inference that defendant knew the contents of the certificate; and it is also a permissible inference that defendant's intention in indorsing the certificate was to enable his firm to complete its hypothecation. The defendant knew, or could readily have found out by reference to the margin book, that there was no claim on this certificate which he could assert. Whether or not his conduct in the handling of this customer's certificate was the result of mistake or intent to feloniously appropriate it was a question for a jury finding. The fact that defendant did pledge the property of another through his office management was sufficient *prima facie* to prove this, and defendant was bound to rebut the inference of a guilty knowledge of the disposition of the property of another through his office force by reason of his active consent through signing a certificate by an indorsement which would enable it to be sold; and his assent to such a disposition is a legitimate deduction from his act in allowing the certificate to go out of his own office to be used in connection with the business of the firm in securing moneys.

Gelobter, the employee who pledged the certificate, was a witness at the trial, and he testified that he kept the stock blotter which contained the entry of daily transactions, the receipt and delivery of stocks, the names of customers, number of certificates, dates of receipt and the dates of going out by delivery. He gave testimony that he found in the blotter sheets of Sugarman & Co. entries in his own handwriting showing the receipt by Sugarman & Co. of the 100 shares of Texas Company stock for the account of Barringer. This entry showed the receipt by Sugarman & Co. of 100 shares of Texas Company stock for account of Edward E. Barringer, together with the number of the certificate " G-56,375." The date shown was November 16, 1921. The next entry in the

blotter sheet showed that it was delivered out by Gelobter himself to Boyd, Halsted & Co., who were members of the New York Stock Exchange, and with whom Sugarman had an account. The delivery out was on the same day that it was received. He identified the certificate and the indorsement of Barringer and the witnessing by one George B. Morris, agent of Sugarman, who had secured the business of Barringer for the Sugarman firm while canvassing for customers in the south. He also identified the signature of Sugarman on the stock certificate, and said that he delivered it to Boyd, Halsted & Co., and it never came back. He received $4,600 for the certificate. When he was asked why he sent stock out, although he claimed he had no instructions to deliver it out, he said: " During the day when the money cashiers used to tell me that money was needed to pay for the incoming securities, I used to take the securities that we had on hand and send them over either to the bank or to our broker, and borrow money on them in order to meet the incoming bills."

When asked who told him to do that, he said nobody told him explicitly to do it, but he said: " I had seen Mr. Sugarman and the preceding cashier do the same, so I thought I could do it myself." He described the operation of the business when he first came there, so far as the use of the stock on hand for the purposes of borrowing was concerned, as follows: " Why, when I first came there, Mr. Sugarman instructed me as to the various ways of keeping this blotter, but during the afternoon when he thought we needed money, he used to come to the cage himself, and take the stock in the drawers, and used to come in during the day, look it over, and then tell me, ' Henry, send this so-and-so and borrow money on it.' In fact he did that until I was proficient enough to do it myself."

He testified, too, that this transaction was one which he carried out in the regular course of business; and on cross-examination he said in explanation of what he meant by the regular course of business: " I mean that all stock coming into the cage we could use if no specific instructions came with it." He testified that when he first came to the place, Sugarman was in and around his office and used to give him instructions; but that later when business increased to such an extent that it required Sugarman's presence elsewhere, Stewart, the manager, gave all the orders to the witness and to the rest of the auditing department. He did not know where Stewart was at the time of the trial. He stated that unless there were specific instructions with respect to stock, the course of the business was to use it, and specific instructions took the form of attaching a slip of paper to the particular stock,

which contained the instructions concerning the disposition of the stock. This particular 100 shares of stock, the subject of the crime, came down to the witness without any memorandum or slip attached, and it contained no instructions not to use the certificate. It was also shown that when securities were received from customers for safekeeping, they were put in a box and not in the drawer of the stock cashier; but that this certificate, which the proof shows was received solely as a deposit until instructions could be given by the customer, was in the drawer of the cashier before it was sent out, and was never put away for safekeeping. This shows that defendant was exercising control of his business; that the certificate of stock which was pledged was actually in his possession a few moments before it was sent out for pledging; that he indorsed it, although there was no legitimate purpose to be subserved at that time by indorsing it; that he transmitted it to his stock cashier, who, as he well knew from the custom of his own house, was accustomed to pledge all stock sent to him unless instructions were given directing him not to do so. It is not necessary, in order to show assent or consent to the hypothecation of a customer's securities, that the accused broker should have seen the certificate for such securities pledged with another. The routine of business in the defendant's office, which was known to him and founded upon his former example when he was giving instructions to his employee and himself taking customers' securities out of the drawer and pledging them, was such that when the defendant indorsed this certificate and placed it in Gelobter's hands, he intended all the consequences of his act, which consequences were, by a legitimate inference, the unauthorized act of pledging the customer's stock, which subsequently happened. The only other inference to be drawn was that the clerk was irresponsible and had, without any previous consent or assent to be gathered from the signing of the certificate and the course of business of the house, taken the stock certificate with other stock, gone forth and pledged it for the benefit of this firm without the defendant's knowledge, consent or assent to be derived from his prior course of conduct. This inference that the defendant's clerk acted without warrant the jury evidently refused to draw. Our conclusion from the facts does not run adverse to this finding.

The record indicates quite conclusively, or at least leans toward a legitimate finding, that if defendant did not know of the specific pledging of this certificate, his lack of knowledge resulted from an avoidance of any endeavor to know what happened in his office, which amounts in law to knowledge. He could not initiate an unlawful and irregular method of transacting business and then

escape responsibility for the consequences thereof by closing his eyes as to the subsequent method of conduct of his business.

In respect of the assignment of error in the learned trial court's charge, we are unable to agree with the contentions of defendant that it was inconsistent when viewed as a complete statement of the law of the case. The court's instruction to the effect that defendant was not required to have personal knowledge of each and every individual transaction in his place of business in order to find him guilty, and the instruction that if the jury found that error or mistake was made by Gelobter or the general manager in causing the stock to be hypothecated without the knowledge of the defendant, they might acquit, are not mutually exclusive propositions. The learned trial court explained fully what he meant by the personal knowledge referred to in this connection, and he correctly defined consent as an active circumstance of concurrence, and assent as a passive act of concurrence prior to the doing by another of the act charged as the crime. There is no requirement of physical premonition in order to constitute the crime. A defendant may not know, at the precise time when a customer's stock is being wrongfully used, that if such act be done, he may become liable for the resulting crime. It suffices if he has sanctioned and assented to such a course and routine of business in his office as must lead inevitably to the unlawful pledging of customers' certificates. Nor was there any prejudicial evidence received in allowing the exhibits known at trial as Nos. 6, 10, 10a and 11 to be introduced. Exhibit 6 was a page from the defendant's own ledger containing the account of the defendant's firm with this complainant. It was proven to be from the defendant's ledger, and showed the status of complainant Barringer's account, and was kept in the handwriting of Gelobter from the time of the receipt of the certificate. It was properly received with the other books of defendant which dishonestly showed that the stock was on hand, when, in fact, it had been pledged with another without explicit or implied authorization. Exhibits 10 and 10a were, the one a check for $100, and the other a slip attached to the check, showing that its companion paper was a draft for money due to Morris for expenses. Morris was the man to whom Barringer, the complainant, on November 14, 1921, four days before the date of the draft, had delivered the certificate of stock in question down south in Salisbury, N. C. The object of introducing these papers was to show that Morris was defendant's agent at the time, and that he had received money of defendant's firm in compensation therefor while acting as such agent. These were properly received, and even if not necessary, were harmless, since

it was not seriously disputed that Morris was the defendant's agent, and uncontested that he had received and forwarded to defendant the complainant's certificate of stock.

The rulings on objections to the admission and exclusion of evidence and the alleged prejudicial summation of the assistant district attorney were not such incidents as were subversive of the defendant's right to a fair trial even if the rulings thereon were erroneous, or the summation somewhat fervid, and would, therefore, not be warrant for a reversal of the judgment.

We have examined, too, the point urged for reversal that some of the remarks in the charge were prejudicial. The learned trial court undoubtedly stressed the importance and propriety of the passage of this act prohibiting the pledging of customers' securities, under which the indictment was laid; but there was nothing more in his statement than that the jurors were not to pass on the propriety of the law. The effect of the remarks was that, the law being on the statute books, it was required to be enforced, and that its design was to prevent conversion of other people's property. This was not error. We are told also that it was improper for the learned trial judge to announce the rule that brokers under the law are held to a high measure of honesty to their clients. We do not think this was putting too severe a test of fidelity on the part of brokers who are often fiduciaries intrusted without bond with the property of customers, and we think this did not make for undue prejudice because of the nature of the crime alleged here.

That we do not advert in this opinion to the other interesting questions which the learned counsel for appellant raises in his brief is not to be ascribed to a failure to examine their validity as arguments for reversal. We have weighed them and consider that each is wanting in sufficient substance to disturb the judgment below.

The judgment of conviction should be affirmed.

CLARKE, P. J., DOWLING, MERRELL and MARTIN, JJ., concur.

Judgment affirmed.