**Lydia LEWIS, etc., et alia, Plaintiffs,**

v.

**William GRINKER, etc., et alia, Defendants.**

**No. CV–79–1740.**

United States District Court, E.D. New York.

March 14, 1991.

Legal Aid Soc., New York City, Main Street Legal Services, Flushing, N.Y., and Washington Square Legal Services, New York City, for plaintiff.

Victor Kovner, Corp. Counsel of City of New York, New York City, for plaintiffs-intervenors.

Andrew J. Maloney, U.S. Atty. E.D.N.Y., for defendant U.S. Dept. of Health and Human Services.

Robert Abrams, Atty. Gen., of State of N.Y., for defendant N.Y. State Dept. of Social Services.

## MEMORANDUM AND ORDER

SIFTON, District Judge.

This class action is before the Court on (1) plaintiffs' motion for summary judgment to make permanent the preliminary injunction entered by this Court on March 5, 1987, enjoining the denial of Medicaid coverage for prenatal care to financially eligible pregnant undocumented alien women in New York State; (2) plaintiffs' motion for summary declaratory judgment or injunction extending Medicaid eligibility to poor undocumented alien children in New York State; and (3) the federal defendant's cross-motion for summary judgment on the same issues.

## BACKGROUND

Plaintiffs commenced this class action to challenge a 1973 regulation of the Secretary of Health and Human Services (the "Secretary") and a companion New York State regulation both denying Medicaid benefits to aliens except those who are lawfully admitted for permanent residence or permanently residing in the United States under color of law ("PRUCOL"). On July 14, 1986, this Court determined that the regulations were not authorized under the Medicaid statute. *Lewis v. Gross*, 663 F.Supp. 1164 (E.D.N.Y.1986). The Court did not reach plaintiffs' other claims challenging the regulations.

Following that decision but before a final judgment was entered, Congress passed the Omnibus Budget Reconciliation Act of 1986 ("OBRA–86"), Pub.L. No. 99–509, *reprinted in* 10 U.S.Code Cong. & Admin.News (100 Stat.) (Dec.1986). Section 9406 of OBRA–86 provided the missing statutory authority for imposing restrictions on Medicaid eligibility for aliens. The law stated that "no payment may be made to a State under this section for medical assistance furnished to an alien who is not lawfully admitted for permanent residence or otherwise permanently residing in the United States under color of law." 42 U.S.C. § 1396b(v)(1). The federal defendant sought reconsideration of this Court's prior ruling in light of this legislative change.

At the same time, plaintiffs moved for a preliminary injunction on the ground that the unborn children of all alien women in this country, whether PRUCOL or not, were eligible for Medicaid under 42 U.S.C. § 1396d(a)(i) as themselves citizens included within the statutory category of eligible "individuals under the age of 21." The Court found that the plaintiffs had shown irreparable injury and a likelihood of prevailing at trial on their claims and issued a preliminary injunction preventing defendants from denying Medicaid coverage for prenatal care to alien women residing in New York State with a medically verifiable pregnancy if the unborn child would be eligible for Medicaid if born at the time of the application. *See* Memorandum and Order, March 5, 1987.

Plaintiffs now seek to make that preliminary injunction permanent on statutory and constitutional grounds. They also challenge the Secretary's interpretation of the PRUCOL restrictions on statutory and constitutional grounds.

For the reasons discussed below, the preliminary injunction is now made permanent. Additionally, a hearing is ordered to determine whether all or part of the plaintiff class of undocumented alien children should be considered PRUCOL and, thus, entitled to Medicaid payments. Thus, the first of plaintiffs' motions for summary judgment listed above is granted. The second and third motions listed above are denied.

## FACTS

The basic facts are not disputed, except where indicated.

It is not disputed that a substantial number of alien pregnant women who are not presently residing in this country under color of law will have their babies in the United States. Under federal law and the Constitution, these babies will be citizens of this country. *See, e.g., INS v. Rios–Pineda*, 471 U.S. 444, 105 S.Ct. 2098, 85 L.Ed.2d 452 (1985).

It is also undisputed that prenatal care is critical to the health of a substantial num-

ber of these future citizens. Children who do not receive prenatal care are, it is undisputed, far more likely to be born with severe and debilitating mental and physical deformities.

Defendants also do not dispute that from a cost effectiveness perspective prenatal care is far superior to subsequent treatment of preventable birth defects. Congress has recognized this cost effectiveness in expanding Medicaid eligibility for pregnant women. 1986 U.S.Code Cong. & Admin.News 3607, 3688–92.

Defendants also do not dispute the proposition that the social costs of failing to provide prenatal care are substantial. As a result of handicaps related to birth defects, many of these children, now born citizens, will be unable to lead productive lives in this country because of their conditions and will be supported by a variety of other social welfare programs.

Plaintiffs also submit undisputed evidence as to the effects of failing to provide non-emergency medical care to alien children in support of their application for injunctive relief based on the Secretary's alleged denial of Medicaid payments to such children who are, plaintiffs contend, PRUCOL. Where such children do not receive preventive health care, it is undisputed that some will end up with severe medical conditions that could have otherwise been avoided. Where an illness becomes an emergency medical condition such that aid will be provided, even under the Secretary's interpretation of the statute, the government will end up paying the medical costs. Further, some number of citizen children and adults will undoubtedly contract contagious diseases as a result of the failure to provide preventive medical care to alien children, imposing unquantifiable additional social and economic costs on the country.

A dispute exists as to INS' policy towards alien children in New York. Defendants contest plaintiffs' contention that INS never deports alien children in New York. While the evidence establishes that INS does not formally deport alien children, the Secretary contends that INS uses other means to enforce their departure from this country and that, as a result, they cannot be considered PRUCOL.

Federal Rule of Civil Procedure 56(c) provides that a court shall grant summary judgment if it determines that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." A party moving for summary judgment has the burden of proving that no genuine issue of material fact exists. Rule 56(e) provides that a party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A party opposing summary judgment may request that the Court search the record and grant it summary judgment if it establishes that there are no genuine issues of material fact raised by plaintiff.

In this case, no genuine issues of material fact exist with respect to plaintiffs' motion concerning pregnant, non–PRUCOL aliens. However, because there are genuine issues of fact surrounding the motion for summary judgment regarding undocumented alien children, both plaintiffs' and defendants' motions for summary judgment are denied pending a hearing to resolve these factual disputes.

## DISCUSSION

### MEDICAID ELIGIBILITY FOR PREGNANT, NON–PRUCOL WOMEN

On March 5, 1987, this Court entered a preliminary injunction enjoining defendants from "denying Medicaid coverage for prenatal care to alien women residing in New York State with a medically verifiable pregnancy if her unborn child would be eligible for Medicaid if born at the time of application." Plaintiffs now seek to make that preliminary injunctive relief permanent. That relief is granted.

## AID TO THE UNBORN

Plaintiffs' principal contention is that they or their unborn children are eligible for medicaid under 42 U.S.C. § 1396d(a)(i) which grants aid to citizen "individuals under the age of 21." Plaintiffs claim that their unborn fetuses should be included in this category.

### Administrative Interpretation

In this Court's March 5, 1987 Memorandum and Order granting a preliminary injunction, the Court recognized that both the federal and state defendants shared "a longstanding administrative interpretation" of the Medicaid statute that the unborn were to be classified as "individuals under the age of 21" for Medicaid eligibility purposes. *See* 42 U.S.C. § 1396d(a)(i). Further, the Court noted that defendants have in the past interpreted the Medicaid statute to provide prenatal care for pregnant women, themselves ineligible for Medicaid, on behalf of the unborn if the unborn would be Medicaid eligible if born at the time of the Medicaid application.

The Court found that the Secretary's longstanding interpretation extending coverage to the unborn was consistent with the purposes and policies of the Medicaid program, because the "undisputed medical evidence shows the overwhelming importance of proper prenatal care to the future health of the infant." *See* Memorandum and Order, March 5, 1987, at 27.

Recently, however, the federal defendant has repudiated this interpretation of the medicaid laws and decided that the unborn are not included within the category of "individuals under 21." The federal defendant urges that the Court's previous decision, based on the federal defendant's earlier interpretation of the statute, now be reversed in the light of the Secretary's new understanding of the statute.

### Deference to Agency Interpretations

The first question is how much deference is due from this Court to the more recent interpretation of the agency.

The federal defendant contends that the principles of *Chevron, USA v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), control this analysis. The Supreme Court has stated:

> "[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."

*Sullivan v. Everhart,* 494 U.S. 83, 110 S.Ct. 960, 964, 108 L.Ed.2d 72 (1990) (citations omitted).

However, in this case, the high level of deference ordered by *Chevron* is inappropriate. The policy of excluding unborn children of non–PRUCOL women from the Medicaid program is interpretative, not legislative. *See Batterton v. Francis,* 432 U.S. 416, 425 n. 9, 97 S.Ct. 2399, 2405 n. 9, 53 L.Ed.2d 448 (1977); *Doe v. Reivitz,* 830 F.2d 1441, 1446 (7th Cir.1987). The agency has not engaged in notice and comment rule making but has established its new policy through a unilaterally issued "State plan pre-print" and Regional Office Manual. Therefore, this Court need not find the agency's interpretation of the Medicaid statute controlling. *St. Mary's Hospital v. Blue Cross & Blue Shield Ass'n,* 788 F.2d 888, 890 (2d Cir.1986).

Still, agency interpretations of congressional enactments are entitled to weight. *St. Mary's Hospital, supra.* Consistency with prior and subsequent pronouncements is a factor to be considered in determining how much deference to accord to an agency's interpretation of a statute. The agency in this case has renounced a longstanding interpretation that the unborn are covered under Medicaid as "individuals under 21." This shift in position warrants less deference to the agency's views than would otherwise be appropriate. "An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view." *INS v. Cardoza–Fonseca,* 480 U.S. 421, 447 n. 30, 107 S.Ct. 1207, 1221 n. 30, 94 L.Ed.2d 434 (1987) (quoting *Watt v. Alaska,* 451 U.S. 259, 273, 101 S.Ct. 1673, 1681, 68 L.Ed.2d 80 (1981)).

## Status of the Unborn

Because the Court is far from bound by the agency interpretation of the medicaid statute, the statute itself must again be examined. The statute does not directly address the issue of coverage for the unborn children of alien women not themselves eligible for Medicaid. The absence of specific provisions for such coverage may, however, be of some significance in the light of the statute's history.

The unborn were at one time included as Medicaid-eligible because the AFDC statute provided AFDC eligibility to the unborn, and Medicaid eligibility turned on AFDC eligibility. However, in 1981, the AFDC statute was amended to exclude eligibility for the unborn, replacing it with expanded coverage for pregnant women. As a result, Medicaid coverage for the unborn was eliminated and coverage for pregnant women, initiated. *See* 42 U.S.C. § 1396d(a)(viii) (pregnant women added as an eligibility group to Medicaid statute).

Subsequently, in recent years, Congress explicitly considered the need for and importance of Medicaid coverage of prenatal care and has specifically responded to that need by expanding Medicaid coverage for pregnant women. The federal defendant argues that these amendments leave no doubt that Congress does not intend to cover unborns in their own right. In these amendments, the federal defendant argues, Congress made clear that it intended to provide prenatal care for the unborn through the provisions of such care to pregnant women.

Thus, the Deficit Reduction Act of 1984 ("DRA"), enacted before the Secretary changed his position on the eligibility of unborn children of non–PRUCOL alien women, added as a mandatory categorically needy group all pregnant women who would be eligible for AFDC if their unborn children were already born and were living with them at the time of payment. *See* 42 U.S.C. §§ 1396a(a)(10)(A)(i), 1396d(n)(1). Congress made clear that, although it was the "pregnant woman" who was the Medicaid recipient, for purposes of determining the woman's financial eligibility, the state is to assume that the child is born and living with the pregnant woman. The Secretary thus requires states to consider the unborn child as living with the woman at the time of the application. 52 Fed.Reg. 430665 (Nov. 9, 1987). OBRA of 1986 again expanded optional coverage of pregnant women, giving the states the option of covering pregnant women who do not satisfy the categorical requirements of AFDC and whose financial situation places them at 100% of the federal poverty level. 42 U.S.C. § 1396a(*l*). Congress once again included the unborn child for purposes of determining the financial eligibility of the pregnant woman. Since 1986, Congress has further expanded optional and mandatory coverage for pregnant woman under OBRA of 1987 and the Medicare Catastrophic Coverage Act of 1988.

The federal defendant argues that what is significant in all of these amendments is that the entity whose eligibility is at issue is the pregnant women rather than the fetus she carries. Thus, Congress appears, as a matter of legislative style, to have chosen to use the pregnant women eligibility group as the vehicle for providing Medicaid coverage of prenatal care.

■ In all events, the phrase "individuals under the age of 21" does not easily apply to unborn children under ordinary usage. The unborn are not "persons" under the Constitution. *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). In addition, the "age" of any individual is normally computed from birth. While the statute does not require calculation of the precise age "under 21" of "individuals under the age of 21," it is apparent that any construction of the phrase "individuals under the age of 21" which will accommodate the unborn is not ordinary usage. Accordingly, I conclude that Congress did not intend the phrase "individuals under the age of 21" to include the unborn.

## AID SHOULD BE GRANTED TO "QUALIFIED PREGNANT WOMEN"

■ Section 1396d(a)(i) does not entitle the "unborn" to receive benefits in their

own right. However, other congressional changes in the complex system of providing medical benefits for the needy have, I conclude, mooted the question. In 1984, Congress passed Pub.Law 98–369, § 2361(a). This law amended the present § 1396a(a)(10)(A) to expand the categories of mandatory eligible Medicaid recipients. As part of this expansion, Congress added subsection (III) which created another new category of eligibility, "qualified pregnant women." An examination of that subsection reveals that the fetus is entitled to receive aid through its mother, even where the mother, prior to pregnancy, is not herself, by reason of her status with INS, eligible for aid.

■ 42 U.S.C. § 1396a(a)(10)(A)(i)(III) provides Medicaid to all "qualified pregnant women." For reasons set out below, I find that the "plain language" of § 1396 includes pregnant non–PRUCOL aliens in the class of "qualified pregnant women." This reading is bolstered by the congressional intent reflected in the legislative history.

42 U.S.C. § 1396d(n) defines a "qualified pregnant woman" as follows:

"The term 'qualified pregnant woman or child' means ... a pregnant woman who ... would be eligible for aid to families with dependent children under part A of subchapter IV of this chapter ... if her child had been born and was living with

her in the month such aid would be paid."

The "plain English" meaning of this statute is that certain pregnant women, not themselves eligible for medical assistance, should nevertheless receive benefits by reason of the status of the unborn child. These benefits should be granted when the ineligible women are (1) pregnant and (2) carrying children whose birth will render the resulting family "eligible for aid to families with dependent children [AFDC]."

Since the non–PRUCOL applicant living in the United States applies for aid under a statute which requires the assumption that the child "had been born ... in [that] month," following § 1396d(n)'s prescribed fiction, the child is considered "constructively" born in the United States and, thus, a United States citizen.

This attention to the status and needs of the unborn child reflects the statute's overall orientation. AFDC concentrates on the needs of the child, not the parent.[1] If the child meets the various criteria to qualify as a "dependent child" then aid will be granted to the child and his or her family. 42 U.S.C. § 606.

Among the relevant criteria is the requirement that the dependent child be a citizen. 42 U.S.C. § 602(a)(33); *Rios–Pineda, supra.* However, as noted above, the "constructive infant" is a citizen.[2] The constructive child and family must meet

---

**1.** "The term 'aid to families with dependent children' means money payments with respect to a dependent child." 42 U.S.C. § 606. "[The act was created for] the purpose of encouraging the care of dependent children in their own homes ... by enabling each State to furnish financial assistance ... to needy dependent children and the parents or relatives with whom they are living." 42 U.S.C. § 601.

**2.** The government argues that the citizenship of the fetus must be the same as the mother. This, however, is beside the point. Section 1396d(n) does not require ascertaining the alienage status of the actual fetus. Rather, it requires us to examine a legislatively constructed setting in which the fetus has been born. Thus, in this section, we are not concerned with the status of the fetus at all but with a constructive child.

The citizenship requirement also requires consideration of the citizenship of the "caretaker

relative." However, the law only requires such consideration to the extent that the caretaker relative's "needs are to be taken into account in making the determination [of total funding level]." *See also Sudomir v. McMahon,* 767 F.2d 1456, 1458 (9th Cir.1985) ("Her [the non-PRUCOL applicant's] application for AFDC benefits was rejected in part by the Department because [she was non-PRUCOL]. That is, the Department ignored [plaintiff's] own needs in calculating her family's monthly AFDC grant.").

Clearly, the plaintiff's non-PRUCOL status would result in a lower level of benefits, because this person's needs would not be taken into account when setting a benefit level. However, the case at bar does not concern the level of AFDC benefits. Rather, it simply requires a determination of whether the family would be eligible for any benefits at all. Neither the statute nor the case law suggests that the parents' status would render the dependent child entirely ineligible.

certain income requirements. 42 U.S.C. §§ 602(a)(18) *et seq.* However, nothing in the record of this case suggests that plaintiffs' class is so wealthy that they would not qualify for aid. Beyond this, nothing in the statute suggests that the "constructive child" would not qualify as a "dependent child." Thus, the family (mother and fictitious child) is entitled to aid under AFDC.

The relevant case law supports this conclusion. Thus, in *Doe v. Reivitz*, 830 F.2d 1441 (7th Cir.1987), the court held that citizen children of illegal alien parents are entitled to benefits under AFDC. *Id.* at 1451 ("The illegal alien parents of these [citizen] children are not seeking benefits for themselves. We do not think that the intent to exclude citizen and eligible alien *children* from the AFDC–UP program should be lightly imputed to Congress.").

■ This holding is nothing more than another example of the general and well-established rule that, where a child is qualified for AFDC, non-economic factors affecting the parents or household generally cannot be used to deny aid. This general rule exists in several forms. It was first articulated as the "Flemming Rule," which in its codified form held that state–AFDC programs could not deny aid "to a child because of the conditions in the home in which the child resides." 42 U.S.C. § 604(b). The Supreme Court has given a broad reading to this rule, holding that factors which do not affect the child's economic well-being cannot be used to deny aid. *King v. Smith*, 392 U.S. 309, 329, 88 S.Ct. 2128, 2139, 20 L.Ed.2d 1118 (1968). *See also Quern v. Mandley*, 436 U.S. 725, 739–43, 98 S.Ct. 2068, 2076–79, 56 L.Ed.2d 658 (1978); *Taylor v. Lavin*, 497 F.2d 1208, 1214 (2d Cir.1974), *rev'd on other grounds*, 421 U.S. 338, 95 S.Ct. 1741, 44 L.Ed.2d 208 (1975). Thus, where the dependent child is a citizen and otherwise eligible for AFDC, the non-citizen status of the parents cannot be used to deny aid.

Because this "constructive" family would be eligible for AFDC, the mothers in this family meet the tests of § 1396d(n) of the Medicaid statute and must be considered a "qualified pregnant woman." Thus, while non–PRUCOL pregnant aliens are not themselves eligible for medical assistance, as a result of their pregnancy they are entitled to prenatal and other medical care under the "qualified pregnant woman" rule.

■ The congressional purposes behind both the Medicaid statute and the AFDC program support this interpretation. Congress' intent with respect to Medicaid for prenatal care was to assure that the fetus is born as a healthy child who does not, as a citizen, become a burden on the country's social welfare system.[3] As with AFDC, the concentration of attention is upon the children or unborn children, and the mother becomes a convenient means through which this aid to the child can be furnished.

Given these purposes, it makes no sense to determine whether a fetus should receive aid based on the status of its mother. If the fetus is the intended beneficiary, aid should be granted based on the beneficiary's qualifications. Since the statute's ultimate goal is to benefit the fetus after birth—to deliver a healthy baby—it is common sense to look to post-birth not pre-birth qualifications.

The Secretary argues that the fetus' potential eligibility for aid is irrelevant because the statute only refers to the pregnant mother's eligibility. However, as noted above, this interpretation disregards the Medicaid Act's plain language, which bases eligibility on AFDC standards which in turn base eligibility on the status of the unborn child. Congress did not intend that § 1396d(n) refer to the pregnant mother's eligibility for AFDC, since no parent is of her own sake eligible for AFDC. In addition, determining eligibility based on the mother's qualifications rather than those of the child-to-be goes against the intended purpose of the act, a purpose which the federal defendant recognizes.

---

**3.** Given the current constitutional problems surrounding the rights of fetuses, it makes perfect sense that Congress should choose this more indirect route toward supplying them with aid.

Defendants also argue that, since § 1396b(v) of the statute now prohibits payments to non–PRUCOL aliens except in emergency situations, it prohibits coverage of prenatal care for the children of such aliens even though such children are deemed United States citizens for the purpose of determining their eligibility for such care. This argument as well must be rejected.

As the foregoing discussion of the interrelation of Medicaid for pregnant women and AFDC makes clear, the intended recipients of the medical coverage for prenatal care are not the non–PRUCOL mothers, but their future children. Non–PRUCOL pregnant aliens serve simply as the conduit for delivering the aid to their children.

The legislative history of the recent legislation also supports the conclusion that subsection (v) does not bar Medicaid coverage for prenatal care for the citizen children of alien mothers. The Omnibus Budget Reconciliation Act of 1986 ("OBRA–86"), from which much of the present § 1396b stems, was designed to cut costs. As the chair of the congressional committee that passed the Medicaid sections of OBRA–86 wrote: "The Committee is greatly concerned about the federal deficit.... In the health field, the Committee adopted extensive provisions that achieve very substantial savings." 1986 U.S.Code Cong. & Admin.News at 3636.

One cost-cutting measure was a significant expansion of the groups of women eligible for prenatal care. As the committee report accompanying OBRA–86 explained, this expansion would significantly reduce costs because "each dollar spent on prenatal care could save over three dollars in reduced health care costs for the care of low birthweight infants." *Id.* at 3688. This conclusion, of course, is amply supported by current medical literature. *See, e.g.,* 313 New Eng.J.Med. 44 (1985) (studies show that proper prenatal care reduces incidents of low birthweight by 75 percent).

Subsection (v) represents another cost-cutting measure. This subsection prohibits direct payments of Medicaid to aliens who are not legal residents or PRUCOL except in emergencies, thus cutting the total number of people entitled to U.S. Government assistance. However, nothing in the section or its purposes requires that the citizen babies of non–PRUCOL aliens must also be denied prenatal care. Indeed, reading subsection (v) to exclude prenatal care for the citizen children of non–PRUCOL aliens would have the effect, as Congress explicitly recognized, of increasing rather than decreasing costs since the ineligible aliens will give birth in the United States and their children become citizens entitled to medical aid, as Congress also recognized. To deny one dollar in prenatal care now would cost three dollars in other federal benefits later when many of the fetuses will be born with significant birth defects.

Congress recognized that subsection (v) should not be used to deny aid, when such denial would ultimately increase, not decrease, costs. The congressional report accompanying OBRA–86 urges administrators to read subsection (v) "broadly" to include potential recipients when possible. Thus, subsection (v)'s ban on "medical assistance furnished to an alien" should not be read to apply to aid clearly understood by Congress to be destined for a future citizen who will be a greater social burden later if denied such care now.

It should be noted that this interpretation hardly renders subsection (v) meaningless. Section 1396 covers many medical services beyond prenatal care. Subsection (v) under any interpretation prohibits provision of non-emergency services to non–PRUCOL aliens except as incidental beneficiaries of the prenatal care of their citizen children.

Despite this strong statement of congressional intent, defendants note that the Secretary of HHS has adopted a narrower interpretation of OBRA in his regulations implementing OBRA–86 and urge this Court to do the same. *See* 55 Fed.Reg. 36816. However, as previously noted in this opinion, this Court is not bound by the interpretation offered by the Secretary. For a variety of considerations including those already discussed and others dis-

cussed below, the government's interpretation, while entitled to deference, must be rejected.

### Avoiding Constitutional Conflicts
### (Ashwander)

In choosing between two potential interpretations of a statute, courts must choose the one, if it exists, that avoids a constitutional conflict. As Justice Brandeis explained:

"The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of.... 'When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.'"

*Ashwander v. Valley Authority*, 297 U.S. 288, 347–48, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J, concurring) (quoting *Crowell v. Benson*, 285 U.S. 22, 62, 52 S.Ct. 285, 297, 76 L.Ed. 598 (1932)). This rule has, of course, been followed in this circuit. "If a court can decide a case on non-constitutional grounds, it should not stray into the field of constitutional analysis." *F.E.C. v. Central Long Island Tax Reform*, 616 F.2d 45, 52 (2d Cir.1980). *See also Carlin Communications v. F.C.C.*, 749 F.2d 113 (2d Cir.1984); *Occidental Chemical Corp v. F.E.R.C.*, 869 F.2d 127 (2d Cir.1989).

The two interpretations presented this Court present the kind of choice referred to in *Ashwander* and *Central Long Island Tax Reform*. The first interpretation of subsection (v) allowing payments for prenatal care for infant citizens of non–PRU-COL aliens avoids constitutional decision making. The second option, however, would force this court to confront several complex constitutional issues of first impression.

Ruling that § 1396b(v) excludes prenatal care for the as-yet-unborn citizen would present this Court with substantial consti-

tutional questions of considerable difficulty. In *Plyler v. Doe*, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982), the Supreme Court ruled that a state could not "rationally" bar the children of illegal aliens from attending school. In holding that this ban was irrational and that it violated the equal protection clause, the Court explained:

"[L]egislation directing the onus of a parent's misconduct against his children does not comport with fundamental conceptions of justice. '[V]isiting ... condemnation on the head of an infant is illogical and unjust. Moreover, imposing disabilities on the ... child is contrary to the basic concept of our system that legal burdens should bear some relationship to individual responsibility or wrongdoing'.... It is thus difficult to conceive of a rational justification for penalizing these children for their presence within the United States....

....

"In addition, education provides the basic tools by which individuals might lead economically productive lives to the benefit of us all.... We cannot ignore the significant social costs borne by our Nation when select groups are denied the means to absorb the values and skills upon which our social order rests."

457 U.S. 202, 220–22, 102 S.Ct. 2382, 2396–97.

It is argued by plaintiffs here that the same logic applies to their situation. Denying prenatal care will result in the birth of numerous citizens hampered by severe birth defects. Not only will such children suffer for themselves, but the burden of caring for a deformed child may demand such time and resources from its parents as to prevent them from otherwise leading economically productive lives. The point is well documented. As sociologist William Julius Wilson has noted:

"For the overwhelmingly female-headed ghetto underclass families, access to quality child care becomes a critical issue if steps are taken to move single mothers into education and training programs and/or full- or part-time employment."

W.J. Wilson, The Truly Disadvantaged 153–54 (1987). If care of healthy children can create such obstacles to employment, care of handicapped children will compound the problem. As Wilson explains:

> "[A]s long as some poor families are unable to work because of physical or other disabilities, public assistance would be needed even if the government adopted a program of welfare reform that included child support enforcement and family allowance provisions."

*Id.* at 154. Thus, denying prenatal care may be forcefully argued to lack the same "rational justification" as denying education lacked in *Plyler*. As such, the denial of prenatal care in the circumstances here presented may well violate the equal protection clause.

Defendants do not dispute these economic results. Rather, they argue that *Plyler* does not apply because it dealt with already-born children ("persons") while the present case deals only with the unborn, who are not "persons" under the fifth or fourteenth amendments. While this is true, it ignores the fact that, as stated above, the pregnant mothers will also be affected. While the pregnant mothers are not citizens, neither were the child-plaintiffs in *Plyler*.

Defendants additionally argue that *Plyler* dealt with a state, not federal, law. As the *Plyler* Court notes, a federal law would be entitled to substantially greater deference. However, as both the Court in *Plyler,* and the Court in *Mathews v. Diaz,* 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976), on which defendants rely heavily, note, even the federal government may not violate the rights of aliens with impunity. "The Fifth Amendment protects aliens whose presence in this country is unlawful from invidious discrimination by the Federal Government." *Plyler, supra* 457 U.S. at 210, 102 S.Ct. at 2391 (citing *Mathews*).

The Court of Appeals for this circuit has recently considered the issue of the deference owed the federal government in alienage and immigration matters. *Azizi v. Thornburgh,* 908 F.2d 1130 (2d Cir.1990). The *Azizi* court held that the federal government is entitled to great deference in this area. Specifically, it held that deportation regulations affecting the right to marriage, a right usually accorded strict scrutiny, need only pass a rational basis test. However, the court explicitly rejected the government's claim that in the field of immigration the courts should avoid any involvement at all.

> "[T]he government suggests that [the case law] mandates a lower level of scrutiny than is required by the rational basis test. We find that no distinction is intended by the descriptive language and therefore conclude that the rational basis test is applicable.
>
> . . . .
>
> "While great deference must be accorded Congress' decision to classify aliens in such a manner, the government must demonstrate some legitimate reason for adoption of the classification."

*Azizi, supra* at 1133.

In setting some standard for review of congressional legislation, the Court of Appeals has held that such legislation "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation." *Francis v. I.N.S.,* 532 F.2d 268, 272 (2d Cir.1976) (The court struck down legislation distinguishing aliens who left the country and then returned from those who never left. The court found that this distinction bore no rational relation to the object of the relevant immigration laws).

Given the stated objectives of the Medicaid statute and of OBRA, subsection (v)'s "relation to the object" of the statutes seems, at best, unclear. As noted above, it may be argued with considerable force that an interpretation of subsection (v), which denies the benefits in this case, would directly undermine both the beneficent purposes of Medicaid and the cost-cutting objectives of OBRA.

This Court should not lightly engage in this constitutional scrutiny of Congress' justifications for its laws or entertain the entirely new question of the rights of the unborn citizen. As noted above, *Ashwan-*

*der* requires this Court to avoid such constitutional analysis when possible. Because a "construction of [§ 1396b(v)] is fairly possible by which the [constitutional problems] may be avoided," this construction is appropriately followed. Accordingly, § 1396b(v) is appropriately read as granting coverage for prenatal care for citizen children of non–PRUCOL aliens.

## MEDICAID ELIGIBILITY FOR UNDOCUMENTED ALIEN CHILDREN

Plaintiffs also move to enjoin the defendants from denying Medicaid benefits to undocumented alien children, and defendants have cross-moved for summary judgment in their favor on this issue. Because several disputes exist with respect to the material facts, both parties' motions for summary judgment on this issue must be denied.

The crux of the plaintiffs' argument is that undocumented, alien children are residing in this country under color of law (PRUCOL) and, thus, may not be denied Medicaid benefits by reason of 42 U.S.C. § 1396b(v), *supra*. Defendants contend that these children are non–PRUCOL and that subsection (v) prohibits granting them Medicaid coverage.

In discussing the new subsection (v), the committee report accompanying OBRA–86 states:

"[T]he Secretary and the States [shall] broadly interpret the phrase 'under color of law' to include all of the categories recognized by immigration law, policy, and practice."

1986 U.S.Code Cong. & Admin.News 3701.

In *Holly v. Lavine*, 553 F.2d 845, 850 (2d Cir.1977) the court considered who should and who should not be included in the category of "under color of law," concluding that the phrase—

"encircles the law, its shadows, and its penumbra. When an administrative agency or legislative body uses the phrase 'under color of law' it deliberately sanctions the inclusion of cases that are, in strict terms, outside the law but are near its border."

The Secretary, in the agency's 1987 Operating Instructions implementing OBRA–86, set out the following definition of PRUCOL:

"Aliens who are PRUCOL and who may be eligible for Medicaid are aliens [who] are residing in the United States with the knowledge and permission of the INS and whose departure from the United States the INS does not contemplate enforcing. An alien will be considered as one whose departure the INS does not contemplate enforcing if:

"a. it is the policy or practice of the INS not to enforce the departure of aliens in a particular category; or

"b. on all the facts and circumstances in that particular case, it appears that INS is otherwise permitting the alien to reside in the United States indefinitely."

1987 Operating Instructions at 3–3–21. This Court's March 5, 1987 decision, *supra*, held that the above standard of PRUCOL was a reasonable interpretation of congressional intent.

Under this definition, plaintiffs must prove three things in order to be considered PRUCOL and, thus, eligible for aid: First, the INS has "knowledge" of the children's existence in this country; second, the INS is "permitting" these children to remain in the country; third, the INS does not "contemplate enforcing" the children's departure.

Genuine issues of fact exist as to whether undocumented alien children meet each of these three tests.

Plaintiffs must first show that the children in question resided in this country "with the knowledge" of the INS.

The government maintains that "knowledge" requires some documentary record of the existence of specific children in the files of the INS—that is, they claim that children cannot exist in this country "with the knowledge" of the INS unless they are documented. The government claims that undocumented aliens such as the children in question here cannot be known to the INS. In support of this interpretation, defendants point to another regulation in the

1987 Operating Instructions, *supra,* which states: "If an alien does not have ... any type of INS documentation, that person is not a lawful permanent resident or PRU-COL." Operating Inst. at 3–3–20.

The government's interpretation must be rejected. Not only does it conflict with ordinary usage,[4] but it conflicts as well with Congress' and the Court of Appeals' instructions to read PRUCOL broadly.

■ Since the government's narrow interpretation must be rejected, some other definition of "knowledge" is still required. Under a fair, broad, and reasonable interpretation of the term, knowledge includes that of which one is aware from personal observation. Moreover, where a person is aware of a high probability of something but deliberately avoids enlightenment, this too constitutes knowledge. As long ago as 1869, the Supreme Court declared that "it is well-settled law that a party cannot wilfully shut his eyes to the means of knowledge ... and thereby escape the consequences which would flow from the notice if it had actually been received." *The Lulu,* 10 Wall. 192, 201, 19 L.Ed. 906 (1869). *See also Armstrong v. McAlpin,* 699 F.2d 79 (2d Cir.1983); *NLRB v. Local 3,* 216 F.2d 285 (2d Cir.1954); *People v. Sugarman,* 216 A.D. 209, 215 N.Y.S. 56, 63 (1st Dep't 1926) ("If defendant did not know of the specific [facts] his lack of knowledge resulted from an avoidance of any endeavor to know what happened ... which amounts in law to knowledge.").

■ To apply these well-accepted definitions of knowledge to this case, several factual issues must be resolved. The INS clearly has actual knowledge of the existence of a substantial number of undocumented alien children. *See* Note 5, *supra.* However, a determination whether appropriate officials of the INS have consciously realized and deliberately closed their eyes to the existence of an entire class of such children is a fact-based inquiry which cannot be resolved on these papers.

■ The next two prongs of this issue likewise present factual issues incapable of resolution on these papers. Assuming that INS does have knowledge of the plaintiff class of undocumented children, have they, in the past, permitted the children to remain in the country and do they, in the future, intend not to deport them?

Plaintiffs claim that, while illegal alien children are here without *de jure* permission, as a matter of policy and practice the INS permits them to remain and does not contemplate deporting them. *See* 1986 U.S.Code Cong. & Admin.News 3701, *supra* (urging consideration not only of "immigration law" but also INS "policy and practice").

In support of their claim, plaintiffs point to the deposition testimony of INS Representative Friess:

"Q: Now, if the parents are in fact deported and they leave the country and they leave the child behind, whether with a close relative or somebody like that, would there then be no order to show cause that would be issued against that child left behind?

"A: Our experience tells us that that almost never happens because the parents usually have an attachment for their children. In fact, we would make some arrangement to get the child out without deportation. Usually working through the consulate of the country from which they came.

"Q: But you would not deport the child?

"A: We could not legally."

Friess Testimony, App. D to Plaintiff's Motion for Summary Judgment, p. 51.

The defendants deny that as a matter of practice they do not deport children. In fact, they point to the same testimony quoted above and specifically to the claim that "we would make some arrangement to get the child out without deportation." Thus, the defendants argue, even though formal

---

4. The INS' designated representative for depositions on INS practices in New York State clearly stated that the INS "knows" in the ordinary sense of the term of the existence of undocumented aliens. In fact, the INS is even aware of the existence of specific children in those cases where the parents have been deported but the children have not. *See* Deposition of INS Representative Friess, App. D to Plaintiff's Motion for Summary Judgment, p. 51.

**1206**

deportation proceedings will not be instituted against children, these children, once discovered, will still not be permitted to remain within the country.[5]

Clearly, the facts here are in dispute. Exactly how INS deals with illegal alien children once these children are brought to INS' attention is a crucial factual matter that must be settled before this Court can render a decision.[6] Accordingly, hearings must be held in which each side can attempt to prove its respective factual contentions.

For all of the reasons stated above, summary judgment on the issue of Medicaid eligibility of alien children is denied to both parties.

### CONCLUSION

Non–PRUCOL, pregnant aliens are, as a matter of law, "qualified pregnant women" who are entitled to Medicaid under 42 U.S.C. § 1396a(a). These women are not barred from receiving aid by 42 U.S.C. § 1396b(v). Accordingly, plaintiffs are entitled to a permanent injunction preventing the defendants from denying aid to these plaintiffs.

Numerous factual issues must be resolved before this Court can determine whether illegal alien children are PRUCOL and thus entitled to aid. Thus, on this second issue, summary judgment is denied to both sides, and a hearing is ordered to settle these factual disputes.

SO ORDERED.

---

**5.** The federal defendant also argues that INS regulations specifically call for the deportation of minor illegal aliens. *See* 8 C.F.R. §§ 242.-3(a), 103.5a(c). This, however, may not be particularly relevant to the current discussion. Even if INS as a matter of policy will deport alien children, if as a matter of practice they do not, then the children will still be PRUCOL. Additionally, INS policy is to treat minors in accord with local state law, and under New York law INS cannot legally institute deportation proceedings against a child. *See* NYCPLR §§ 309(a), 1201, 1203. Thus, the stated national policy of the INS may not even apply here.

**6.** Plaintiffs also raise a number of constitutional arguments. Essentially, they claim that denying Medicaid benefits to these children would violate the equal protection clause of the fifth and fourteenth amendments. These arguments should not be addressed now. If this court ultimately determines that these children are PRUCOL, then they will be granted benefits and the constitutional issue is moot. If these children are not granted benefits, then this Court will, by needs, turn to the constitutional issues. However, as noted *supra*, constitutional issues should not be taken up until all nonconstitutional methods of resolution have been exhausted.