252 F.3d 567 (2nd Cir. 2001)
 LINDA LEWIS, Plaintiff-Appellee,
CITY OF NEW YORK, NEW YORK HEALTH AND HOSPITALS CORPORATION, Intervenors-Plaintiffs-Appellees, CESAR PERALES, Commissioner of the New York State Department of Social Services, Defendant-Appellee,
v.
TOMMY G. THOMPSON, Defendant-Appellant.
 No. 00-6104
 UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT
 December 5, 2000, Argued
May 22, 2001, Decided
Amended June 6, 2001, and July 27, 2001.
 
 Thomas M. Bondy, Wash., D.C. (David W. Ogden, Acting Asst. Atty. Gen., Mark B. Stern, Dep't of Justice, Wash., D.C.; Loretta E. Lynch, U.S. Atty., Brooklyn, N.Y., on the brief), for defendant-appellant.
 Richard Blum, New York, N.Y. (Helaine M. Barnett, Scott A. Rosenberg, The Legal Aid Soc'y, New York, N.Y., on the brief), for plaintiff-appellee.
 Michael D. Hess, Gail Rubin, Elizabeth S. Natrella, N.Y. City Corp. Counsel, New York, N.Y., on the brief, for intervenors-plaintiffs-appellees. Eliot Spitzer, N.Y. State Atty. Gen., Mary Fisher Bernet, Marion R. Buchbinder, New York, N.Y., on the brief, for defendant-appellee.
 (Beth D. Jacob, Brobeck Phleger & Harrison, New York, N.Y., submitted a brief for amici curiae Am. Coll. of Obstetricians and Gynecologists, Am. Med. Ass'n, Am. Pub. Health Ass'n, Greater N.Y. March of Dimes Birth Defects Found., N.Y. State Pub. Health Ass'n, N.Y. Academy of Med., Pub. Health Ass'n of N.Y. City, Am. Academy of Pediatrics, N.Y. Obstetrical Soc.).
 Before: NEWMAN, KEARSE, and WINTER, Circuit Judges.
 JON O. NEWMAN, Circuit Judge.
 
 
 1
 The principal issues on this appeal are whether Congress, in enacting in 1996 what is usually called the Welfare Reform Act ("the Act"),[1] prohibited most female illegal (technically "unqualified") aliens from receiving Medicaid-sponsored prenatal care, and, if so, whether that restriction is unconstitutional with respect to either the alien mothers or their United States citizen children. The Secretary of the Department of Health and Human Services ("Secretary") appeals from the January 19, 2000, order of the District Court for the Eastern District of New York (Charles P. Sifton, District Judge), denying a motion to lift a long-standing injunction barring the denial of prenatal care to these aliens. Lewis v. Grinker, 111 F. Supp. 2d 142 (E.D.N.Y. 2000) ("Lewis VI"). The Court ruled that the Act should be read to deny prenatal care to unqualified aliens, but that this denial is unconstitutional under the Supreme Court's reasoning in Plyler v. Doe, 457 U.S. 202, 223-24, 72 L. Ed. 2d 786, 102 S. Ct. 2382 (1982).
 
 
 2
 Although we agree with the Court's interpretation of the Act, we conclude that the denial of prenatal care is not unconstitutional. However, we also conclude, in agreement with the District Court, that citizen children of alien mothers are entitled to automatic eligibility for Medicaid benefits for a year after birth equivalent to the automatic eligibility extended to the citizen children of citizen mothers. We therefore reverse the District Court's order holding the statute unconstitutional as applied to prenatal care, and remand to the Court to modify the injunction so that it requires the Secretary only to enable the citizen children of unqualified alien mothers to obtain automatic Medicaid eligibility on the same basis as the citizen children of citizen mothers.
 
 Background
 
 3
 The injunction at issue was imposed in 1987, in litigation that began in 1979. As we recognized on the prior appeal in this litigation, Lewis v. Grinker, 965 F.2d 1206 (2d Cir. 1992) ("Lewis V")[2], the prenatal care provisions of the Medicaid statute are among the most complex in a statute that is one of the "most intricate ever drafted by Congress." Id. at 1216 (internal quotation marks omitted). Understanding the parties' contentions therefore requires a regrettably detailed review of the lengthy history of this action, as well as the evolution of Medicaid law as it pertains to prenatal care and aliens.
 
 I. The Framework of Medicaid
 
 4
 Medicaid is a "co-operative federal/state cost-sharing program designed to enable participating states to furnish medical assistance to persons whose income and resources are insufficient to meet the costs of necessary medical care and services." DeJesus v. Perales, 770 F.2d 316, 318 (2d Cir. 1985). State participation in Medicaid is optional, but once a state chooses to participate, it must comply with federal statutes and regulations.
 
 
 5
 The basic framework of the Medicaid program has changed little since its inception in 1965. States submit "plans for medical assistance" to the Department of Health and Human Services ("HHS"). 42 U.S.C.A. 1396a (a), (b) (West 1992 & Supp. 2000).[3] If the plan is approved, the federal government partially reimburses the state for the state's expenditures in subsidizing medical services for needy citizens covered by its plan.
 
 
 6
 States enjoy some flexibility in determining the breadth of a Medicaid plan, but are nonetheless cabined by a set of eligibility rules. The class of individuals eligible for Medicaid benefits comprises three categories: the "mandatory categorically needy," the "optional categorically needy," and the "optional medically needy."
 
 
 7
 At a minimum, participating states must extend their Medicaid coverage to the "mandatory categorically needy." 42 U.S.C.A. 1396a (a)(10)(A)(i); 42 C.F.R. 435.110. This category principally includes individuals already receiving some other need-based government benefit, most commonly Aid to Families with Dependent Children ("AFDC"). 42 U.S.C.A. 1396a (a)(10)(A)(i)(I).
 
 
 8
 A state may, but need not, expand the ambit of its plan beyond the mandatory categorically needy. It can do so in two ways. First, a state can include those who qualify as "optional categorically needy." Id. 1396a(a)(10)(A)(ii); 42 C.F.R. 435.200. The "optional categorically needy" must meet two prerequisites. They must be individuals in listed groups such as the elderly, the blind, and the disabled, 42 U.S.C.A. 1396d (a), people who are likely to be uniquely vulnerable or in need of medical supervision. In addition, with a few exceptions, they must meet the "income and resource requirements" for some other form of government aid, such as AFDC. 42 U.S.C.A. 1396a (a)(10)(A)(ii)(I)-(VIII). These individuals need not be receiving such aid (if they were, they would qualify as "mandatory categorically needy"). One group within the "optional categorically needy" that becomes specially important to this litigation are "individuals . . . under the age of 21." Id. 1396d(a)(i).[4]
 
 
 9
 Second, a state may extend its Medicaid plan further to encompass the "optional medically needy." This category includes the same groups of vulnerable individuals who qualify as "optional categorically needy," but offers a higher income and resources ceiling. 42 U.S.C.A. 1396a (a)(10)(C); 42 C.F.R. 435.301 .
 
 
 10
 New York joined Medicaid in 1965 by adopting a plan extending coverage to all three eligibility categories. See ch. 256, 1966 N.Y. Laws, codified as amended, N.Y. Soc. Serv. Law 363-69 (McKinney 1992 & Supp. 2000).
 
 II. 1965 to 1979: Medicaid Developments
 A. Coverage of Prenatal Care
 
 11
 For some time, it was unclear whether states must, or even may, extend Medicaid coverage to prenatal care. Although the program has long covered many different forms of medical assistance, including hospital visits and physicians' services, 42 U.S.C.A. 1396d (a), the eligibility of pregnant women for any aid was not self-evident from the statute. As explained above, aside from special coverage for the elderly, the blind, and other particularly needy groups, Medicaid coverage is principally tied to eligibility for another form of government aid, usually AFDC, and a woman, pregnant for the first time, was not clearly covered by these programs.
 
 
 12
 When first enacted, the Medicaid statute was silent as to coverage for pregnant women. However, prior to the enactment of Medicaid, the Secretary permitted states to offer AFDC assistance to a pregnant woman under the theory that her fetus qualified as a "dependent child" under AFDC.[5] For a period of time after the advent of Medicaid, states could offer Medicaid to pregnant women if they were receiving AFDC assistance under this theory.
 
 
 13
 In addition to this avenue, the Department of Health, Education and Welfare ("HEW") (predecessor to HHS) permitted states to offer Medicaid benefits for prenatal care on the theory that unborn fetuses were "individuals under the age of 21" and therefore qualified as "optional categorically needy." Lewis v. Grinker, 1987, No. CV 79-1740, 1987 WL 8412, at *7-*9 (E.D.N.Y. 1987) ("Lewis III"). This approach regarded the (otherwise ineligible) woman as a conduit for furnishing medical assistance to the eligible fetus.
 
 B. Eligibility of Aliens
 
 14
 The 1965 Medicaid statute was also silent on the availability of Medicaid to aliens.[6] HEW at first read the statute to permit states to offer Medicaid assistance to aliens. However, in 1973, Congress amended the Social Security Act to explicitly deny social security benefits to aliens. Pub. L. No. 92-603, 301, 86 Stat. 1329, 1471 (1972). The Secretary apparently took this to evince a congressional desire to withdraw all federally subsidized benefits from aliens, and promptly issued a regulation denying Medicaid eligibility to any alien who was not a permanent resident or "otherwise permanently residing in the United States under color of law."[7] 38 Fed. Reg. 30,259 (1973), reprinted in Lewis V, 965 F.2d at 1212. This latter status, for which the acronym PRUCOL is used, is an amorphous and "elastic" one, but this Court has read it to include at least those aliens who are residing in the United States with the INS's knowledge and permission and whom the INS does not contemplate deporting. Berger v. Heckler, 771 F.2d 1556, 1575-76 (2d Cir. 1985); see also 42 C.F.R. 435.408 (defining PRUCOL and listing fifteen non-exclusive examples of non-PRUCOL aliens).
 
 
 15
 III. 1979 to 1985: Lewis I and Medicaid Developments
 
 A. Filing of the Complaint
 
 16
 Thus, by 1979, although the Medicaid statute was silent as to both prenatal care and aliens, the Secretary read it to permit states to offer prenatal care to pregnant women, but not to permit states to offer any aid to non-PRUCOL aliens. In that context, Plaintiff Lydia Lewis filed this class action in 1979. She filed the claim on behalf of a putative class initially certified to include "all aliens residing in the State of New York who have been denied Medicaid on the basis of their alienage," LewisVI, 111 F. Supp. 2d at 147 n.7 (internal quotation marks omitted), thus challenging the denial of Medicaid benefits to non-PRUCOL aliens. This class was certified on January 16, 1981.[8]
 
 
 17
 The Plaintiffs challenged the Secretary's alienage regulation on several grounds, but their principal claim was that the denial of all Medicaid services on the basis of alienage was either contrary to the Medicaid statute or unconstitutional as a denial of equal protection. They also argued the narrower proposition that the denial of prenatal care to pregnant aliens (and their unborn fetuses) was invalid. See Lewis VI, 111 F. Supp. 2d at 148 (recounting prior history of litigation).
 
 B. Statutory Changes
 
 18
 During the early pretrial stages of this litigation, Medicaid underwent several changes relevant to the case.
 
 1. OBRA '81
 
 19
 First, Congress passed the Omnibus Budget Reconciliation Act of 1981 ("OBRA '81"), Pub. L. No. 97-35, 95 Stat. 357 (1981). This statute ended the Secretary's practice of allowing states to give AFDC money to pregnant women on the theory that their fetuses were "dependent children," id. 2312(b), 95 Stat. at 853, but nonetheless authorized states to provide a pregnant woman with AFDC funding during the last three months of pregnancy if she would be eligible upon the birth of her child, id. 2312(a), 95 Stat. at 853. In the same provision, Congress permitted states to treat such a woman as participating in AFDC for purposes of Medicaid--and therefore as "mandatory categorically needy"--but without the three-month limitation. Id. 2312(a), codified as amended at 42 U.S.C.A. 1396d (n)(1)(A). She would therefore be eligible for Medicaid throughout her pregnancy. The concept that underlies deeming a woman eligible for government benefits if she would be eligible upon the birth of her child has become known as "constructive birth."
 
 
 20
 OBRA '81 opened another avenue to states wishing to extend Medicaid coverage to pregnant women. The statute required states that chose to provide Medicaid to the "optional medically needy" also to provide aid to needy pregnant women. Id. 2171(a), codified as amended at 42 U.S.C.A. 1396a (a)(10)(C)(ii). Thus, OBRA '81 gave states two additional avenues by which they could offer Medicaid to pregnant women, but states were not required to do so.[9]
 
 
 21
 In the period after OBRA '81, the Secretary appears to have continued permitting states to offer prenatal care on the theory that fetuses are "individuals under the age of 21," and therefore qualify as "optional categorically needy." Lewis III, 1987 WL 8412, at *9.
 
 2. DRA '84
 
 22
 Three years after OBRA '81, Congress made Medicaid coverage of needy pregnant women mandatory by adding "qualified pregnant women or children" to the list of "mandatory categorically needy." Deficit Reduction Act of 1984 ("DRA '84"), Pub. L. No. 98-369, 2361(a), 98 Stat. 494, 1104 (1984), codified as amended at 42 U.S.C.A. 1396a (a)(10)(A)(i)(III). Congress preserved the "constructive birth" approach of OBRA '81 by defining "qualified pregnant woman or child" to mean any woman medically verified as pregnant who would be eligible for AFDC "if her child had been born and was living with her in the month such aid would be paid." Id. 2361(b), codified as amended at 42 U.S.C.A. 1396d (n)(1)(A).
 
 
 23
 The DRA '84 also added an "automatic eligibility" provision to Medicaid in order to expedite the provision of federally sponsored post-natal care to newborns. The statute provided that a child born to a woman on Medicaid would automatically receive Medicaid assistance for a year following the child's birth so long as the mother remained Medicaid-eligible and the child continued living with her. Id. 2362(a), codified as amended at 42 U.S.C.A. 1396a (e)(4).
 
 3. COBRA '85
 
 24
 A year later, Congress again expanded Medicaid funding for pregnant women. In the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA '85"), Congress broke the link between AFDC and Medicaid, permitting a pregnant woman to receive Medicaid assistance even if she would be ineligible for AFDC for some non-financial reason upon the birth of her child, so long as she met the financial and resource requirements for AFDC eligibility. Pub. L. No. 99-272, 9501(a), 100 Stat. 82, 202 (1986), codified at 42 U.S.C.A. 1396d (n)(1)(C); 52 Fed. Reg 43,065 (1987). So, for example, a needy pregnant woman who was living with her employed husband would not have been eligible for AFDC (which required that the eligible child be "deprived of parental support," 42 U.S.C.A. 606 & 607(a)), but would have been eligible for Medicaid after OBRA '85.
 
 C. The Decision in Lewis I
 
 25
 On July 14, 1986, Judge Sifton ruled that the Secretary's regulation barring non-PRUCOL aliens from receiving any Medicaid benefits violated the Medicaid statute. Lewis v. Gross (Lewis I), 663 F. Supp. 1164 at 1184. Judge Sifton therefore did not then have occasion to consider the Plaintiffs' narrower argument that the denial of prenatal benefits to non-PRUCOL aliens was unlawful.
 
 
 26
 IV. 1986-1992: Lewis II-Lewis V and Medicaid Developments
 
 1. OBRA '86
 
 27
 Soon after Judge Sifton issued his ruling in Lewis I, Congress responded[10] by amending the Medicaid statute to bar aid to non-PRUCOL aliens[11] for any condition short of a medical emergency. See The Omnibus Budget Reconciliation Act of 1986 ("OBRA '86"), Pub. L. No. 99-509, 100 Stat. 1874, 2057 (1986).[12] The statute defined an "emergency medical condition" to mean:
 
 
 28
 a medical condition (including emergency labor and delivery) manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in --
 
 
 29
 (A) placing the patient's health in serious jeopardy,
 
 
 30
 (B) serious impairment to bodily functions, or
 
 
 31
 (C) serious dysfunction of any bodily organ or part.
 
 
 32
 OBRA '86, 9406(a), 100 Stat. at 2058, codified at 42 U.S.C.A. 1396b (v)(3).
 
 
 33
 Even as it narrowed the access of aliens to Medicaid, OBRA '86 once again expanded coverage of prenatal care, creating a new "optional categorically needy" group for pregnant women seeking "services related to pregnancy." See OBRA '86, 9401(a), 100 Stat. at 2050, codified as amended at 42 U.S.C.A. 1396a (a)(10)(A)(ii)(IX) & (l)(1). This new category offered more flexible financial eligibility ceilings than had the earlier provisions for pregnant women.
 
 2. From Lewis II to Lewis IV
 
 34
 In light of the new alienage restrictions in OBRA '86, the Secretary moved to vacate the Lewis I injunction. The Plaintiffs argued in opposition that OBRA '86 should not be given retroactive effect, and that the ruling in Lewis I should therefore support relief for denials of prenatal care made before January 1, 1987, the effective date of OBRA '86.
 
 
 35
 On April 23, 1987, the District Court rejected the Secretary's request to vacate the Lewis I injunction, concluding that members of the plaintiff class were still entitled to relief for the period before January 1, 1987. Lewis v. Grinker, 660 F. Supp. 169 (E.D.N.Y. 1987) ("Lewis II").[13]
 
 
 36
 However, the proceedings were far from over. Some time earlier, the Secretary had prepared an internal agency directive ordering that non-PRUCOL aliens be deemed ineligible for prenatal care. The Plaintiffs asked the Court to declare the directive illegal and enjoin its enforcement. The Plaintiffs' theory was that the fetuses of even non-PRUCOL women were still optionally eligible for Medicaid as "individuals under the age of 21." 42 U.S.C.A. 1396d (a)(1). They argued in the alternative that the directive was unconstitutional.
 
 
 37
 On March 5, 1987, the District Court issued a preliminary injunction enjoining implementation of the directive. Lewis III, 1987 WL 8412, at *12. The Court concluded that, because the Secretary had, at least until that point, continued to consider fetuses as "individuals under the age of 21," federally subsidized medical assistance was available to these fetuses in the form of prenatal care under the "optional categorically needy" category of Medicaid. Id. at *9. The Court declined to permit the Secretary to abandon this long-standing administration interpretation in a litigation position, and ruled that the existing interpretation must prevail unless Congress had clearly altered it. Judge Sifton found no such change in the alienage restriction in OBRA '86, in part because an unborn fetus, which will become a United States citizen at birth,[14] is not clearly a non-PRUCOL alien. Id. at *8. Judge Sifton also noted that Congress had steadily expanded Medicaid coverage for prenatal care in OBRA '86 itself. Id. at *9.
 
 
 38
 On March 14, 1991, the District Court issued a permanent injunction forbidding the Secretary from denying prenatal care to non-PRUCOL aliens. Lewis v. Grinker, 794 F. Supp. 1193 (E.D.N.Y. 1991) ("Lewis IV"). Since the issuance of the preliminary injunction, the Secretary had formally renounced his interpretation that "individuals under the age of 21" included fetuses. Judge Sifton therefore abandoned his earlier deference to the Secretary's long-standing interpretation of the "under the age of 21" provision and considered the provision anew. Id. at 1197.
 
 
 39
 Judge Sifton concluded that Congress had evidenced a desire since 1981 to focus on the mother in determining eligibility for delivering medical assistance to newborns, and that the "under the age of 21" provision therefore could no longer be read to include the unborn. Id. at 1198.
 
 
 40
 Nevertheless, Judge Sifton found the Secretary's directive denying prenatal care to non-PRUCOL aliens invalid on another ground. He turned to the provision of the Deficit Reduction Act of 1984 that added "qualified pregnant women" to the list of mandatory categorical needy, 42 U.S.C.A. 1396a (a)(10)(A)(i)(III), and noted that the definition of "qualified pregnant woman," id. 1396d(n), is keyed to the woman's eligibility for AFDC upon the child's birth. However, the woman's eligibility for AFDC turns on the child's compliance with the prerequisites of coverage. And while there has long been an alienage restriction for children seeking AFDC eligibility, see 42 U.S.C.A. 602 (a)(33), repealed by Pub. L. No. 104-193, 103(a)(1), 110 Stat. 2112 (1996), there is no such restriction for the mother who will be receiving money on her citizen child's behalf. Since the child will be an American citizen at birth, Judge Sifton concluded, even a non-PRUCOL mother will be eligible for AFDC upon the birth of her child, and therefore will be a "qualified pregnant woman" for purposes of Medicaid. See Lewis IV, 794 F. Supp. at 1199-1200. Judge Sifton found this result to be consistent with Congress's purpose in enacting OBRA '86, which was to reduce spending. Id. at 1201. Finally, Judge Sifton declined to consider the Plaintiffs' constitutional challenge, but noted that his interpretation avoided serious constitutional difficulties otherwise presented by the statute. Id. at 1202-04.
 
 3. Lewis V
 
 41
 On January 31, 1992, on the Secretary's appeal from Judge Sifton's permanent injunction, we affirmed.[15] Lewis V, 965 F.2d at 1206. However, our statutory construction followed a different path than that taken by Judge Sifton in either Lewis III or Lewis IV. We acknowledged that the plain text of OBRA '86 excluded non-emergency aid to non-PRUCOL aliens, and that prenatal care did not fall within the definition of an emergency condition. Nevertheless, noting that the Medicaid Act is a statute of "unparalleled complexity," and that "few areas are more complex than the coverage of prenatal care," id. at 1216 (internal quotation marks omitted), and further noting the possibility that an amendment in such a complex area might yield unforeseen results, we turned to the legislative history to see if there was evidence that Congress contemplated the impact that a literal application of the blanket alienage provision would have on eligibility for prenatal care.
 
 
 42
 Far from finding evidence that Congress considered the issue, we located "direct evidence" of congressional inattention.[16] See id. at 1216-18. Although we were reluctant to reject the clear direction of the statutory text, even if it produced an unexpected result, we concluded that this was a special case for two reasons. First, the unexpected result in this case ran counter to the clear purpose of the statute: to make government more cost-effective. We noted in particular that Congress had increased access to government-sponsored prenatal care in another portion of OBRA '86, as well as in other statutes over many years, explicitly to save money. Id. at 1219.
 
 
 43
 Second, we reasoned that to interpret OBRA '86 to deny prenatal care to non-PRUCOL pregnant women "would raise serious equal protection questions," since a child born to a citizen mother would receive "automatic" Medicaid eligibility under DRA '84, while a child born to an unqualified alien mother seeking Medicaid would be denied Medicaid eligibility. Id. at 1217-18; see also 42 U.S.C.A. 1396a (e)(4); 42 C.F.R. 435.117.
 
 
 44
 We therefore concluded that this was one of those "rare and exceptional" circumstances where legislative intent and purpose should prevail over clear statutory text, and we affirmed the District Court's injunction. Lewis V, 965 F.2d at 1222 (internal quotation marks omitted).
 
 
 45
 V. 1992 to the Present: Lewis VI and the Welfare Reform Act
 
 1. The Welfare Reform Act
 
 46
 In the 1996 Welfare Reform Act, Congress altered the terrain of this case yet again by imposing sweeping restrictions on aliens' access to federally sponsored government aid. The Act, as amended, provides:
 
 
 47
 Notwithstanding any other provision of law and except as provided in subsection (b) of this section, an alien who is not a qualified alien (as defined in section 1641 ofthis title) is not eligible for any Federal public benefit (as defined in subsection (c) of this section).
 
 
 48
 8 U.S.C.A. 1611 (a). A "qualified alien" is narrowly defined as
 
 
 49
 an alien who, at the time the alien applies for, receives, or attempts to receive a Federal public benefit, is --
 
 
 50
 (1) an alien who is lawfully admitted for permanent residence under the Immigration and Nationality Act,
 
 
 51
 (2) an alien who is granted asylum under section 208 of such Act,
 
 
 52
 (3) a refugee who is admitted to the United States under section 207 of such Act,
 
 
 53
 (4) an alien who is paroled into the United States under section 212(d)(5) of such Act for a period of at least 1 year,
 
 
 54
 (5) an alien whose deportation is being withheld under section 243(h) of such Act . . .[,]
 
 
 55
 (6) an alien who is granted conditional entry pursuant to section 203(a)(7) of such Act as in effect prior to April 1, 1980[,] or
 
 
 56
 (7) an alien who is a Cuban and Haitian entrant (as defined in section 501(e) of the Refugee Education Assistance Act of 1980).
 
 
 57
 Id. 1641(b) (citations omitted).[17] An unqualified alien cannot receive any federally sponsored aid, with only a few explicit exceptions.[18] The first of these exceptions is for Medicaid assistance for an "emergency medical condition." Id. 1611(b)(1)(A).[19] The Welfare Reform Act retained the definition of "emergency medical conditions" from OBRA '86. See 8 U.S.C.A. 1611 (b)(1)(A); 42 U.S.C.A. 1396b (v)(3).
 
 
 58
 The definition of "qualified aliens" excludes many PRUCOL aliens who were eligible for Medicaid under OBRA '86,[20] and the Welfare Reform Act therefore expanded the class of aliens who are largely ineligible for Medicaid (except for emergency care). Under OBRA '86, only non-PRUCOL aliens were denied non-emergency Medicaid assistance. After the Welfare Reform Act, all non-PRUCOL aliens plus a sizable class of PRUCOL aliens are denied non-emergency Medicaid assistance.
 
 
 59
 Especially pertinent to the pending appeal, the legislative history of the Act explicitly reveals Congress's understanding that conventional prenatal care does not qualify as aid for an "emergency medical condition." In discussing the alienage restrictions in the bill, the House Conference Report emphasizes:
 
 
 60
 The allowance for emergency medical services under Medicaid is very narrow. The conferees intend that it only apply to medical care that is strictly of an emergency nature, such as medical treatment administered in an emergency room, critical care unit, or intensive care unit. The conferees do not intend that emergency medical services include pre-natal or delivery care assistance that is not strictly of an emergency nature as specified herein.
 
 
 61
 H.R. Conf. Rep. No. 104-725, at 380 (1996) (emphasis added), reprinted in 1996 U.S.C.C.A.N. 2649, 2768.
 
 2. Lewis VI
 
 62
 After enactment of the Welfare Reform Act, the Secretary once again asked the District Court to reconsider its injunction. Judge Sifton denied the request. Lewis VI, 111 F. Supp. 2d at 144. He agreed with the Secretary that Congress had now made clear its intent to deny federally subsidized prenatal care to illegal aliens, and that the considerations identified by this Court in Lewis V that had warranted a departure from the prior statutory text were no longer applicable. Id. at 155-63.
 
 
 63
 Finding the statute clear, the District Court then had to consider the Plaintiffs' challenge to the constitutionality of the denial of prenatal care to alien mothers. Ruling that at least some members of the plaintiff class had standing to assert the third-party rights of their newborn citizen children, the Court noted that the statute was harming citizen children by visiting upon them debilitating conditions caused by a denial of prenatal care and by denying them automatic newborn eligibility for Medicaid, and that both these consequences occurred only because of the alienage status of their parents. The Court then applied the heightened scrutiny of Plyler, id. at 169-82, in which the Supreme Court invalidated, for lack of a "substantial" rationale, a Texas statute that denied a free public education to children of illegal aliens, 457 U.S. at 224. That statute, Plyler observed, "imposed a lifetime hardship on a discrete class of children not accountable for their disabling status." Id. at 223.
 
 
 64
 Next, Judge Sifton considered the Secretary's rationales for the denial of Medicaid for prenatal care. Characterizing them as "highly speculative," Lewis VI, 111 F. Supp. 2d at 184 (internal quotation marks omitted), the Court concluded that the Secretary had not met her burden of demonstrating substantial government purposes for the denial, and therefore invalidated the denial as violative of the Equal Protection Clause of the Fifth Amendment, see id. at 183-86.
 
 Discussion
 I. Prenatal Care and Aliens
 
 65
 Before considering the Plaintiffs' challenge to the District Court's literal interpretation of the Act to deny prenatal Medicaid assistance to unqualified aliens and the Secretary's challenge to the Court's ruling that the Act, thus interpreted, is unconstitutional, we set forth what the record discloses concerning the consequences of upholding the Secretary's position. These circumstances affect at least the context in which the parties' claims must be evaluated, and, to some extent, bear on the analysis of the claims themselves.
 
 
 66
 First, affidavits submitted by the Plaintiffs suggest substantial harm to the children of alien mothers as a result of the Act. Children who are denied prenatal care are substantially more likely to be born premature and with debilitating physical and mental disabilities, are more likely to be plagued by an array of life-threatening diseases throughout their lives, and have a much shorter life expectancy. Furthermore, studies link the success of a poor woman's pregnancy and the health of her child to her eligibility for prenatal care under Medicaid. See Declaration of Dr. Solan Chao P 61, at 18.
 
 
 67
 The record also indicates that furnishing prenatal care is vastly more cost-effective than is treating the medical ailments that result from a lack of prenatal care. Prenatal care usually consists of a series of routine visits to a doctor, who monitors the health of the mother and the fetus and counsels the mother on steps she can take to ensure the birth of a healthy child. If problems are observed during prenatal monitoring, it is less expensive to intervene while the woman is pregnant than to treat the child's resulting life-long disabilities. See Affidavit of Dr. Victor W. Sidel P 90, at 22. Studies estimate that anywhere from $ 2 to $ 10 can be saved in medical treatment costs for every dollar spent on preventive prenatal care. See Affidavit of Dr. Howard L. Minkoff P 38-42, at 13-15; see also Chao Decl. P 8, at 3. The New York State Department of Health believes that the costs of furnishing prenatal care for the more than 13,000 annual births to undocumented pregnant women in New York would be almost completely recouped by the savings from the decrease in initial postnatal hospitalizations alone, without even considering the vast savings from not having to treat these children's lifetime health problems that would have resulted from denial of prenatal care.
 
 
 68
 Finally, there may be substantial public health costs. During the 1980s, the infant mortality rate in this country was the highest among 22 industrialized countries. Approximately one percent of all babies in the United States died before their first birthday, and ten percent of all babies were born with low birth weight and were therefore much more susceptible to disabilities. Incidents of post-natal death and disabilities were highly concentrated among the poor in urban centers. After Congress increased the access of the poor to prenatal care in statutes like OBRA '81, COBRA '85, and OBRA '86, the rate of infant mortality steadily improved: in 1980, 12.6 per 1,000 babies died before their first birthday, while by 1992, the rate had decreased to 8.5 per 1,000. In the opinion of at least one expert, denying illegal aliens Medicaid-sponsored prenatal care risks abandoning more than a decade's investment in expanding access to prenatal care in America's inner cities. See Minkoff Aff. P 43, at 15.
 
 II. Statutory Interpretation
 
 69
 Rejecting the contention of the Plaintiffs, we agree with the Secretary and the District Court that the Welfare Reform Act should be read to deny federally-sponsored prenatal care to unqualified aliens.
 
 
 70
 Examining first the text of the statute, we note that section 401(a) of the Welfare Reform Act is unequivocal: a non-qualified alien "is not eligible for any Federal public benefit" unless she meets one of the exceptions in subsection (b). 8 U.S.C.A. 1611 (a). The only exception that might conceivably apply to the plaintiff class is the first, which permits aid necessary to treat an "emergency medical condition." 8 U.S.C.A. 1611 (b)(1)(A). However, the statute defines "emergency medical condition" so narrowly as to make clear that conventional prenatal care is not within the exception. 42 U.S.C.A. 1396b (v)(3).[21] In Lewis V we considered a similar blanket alienage restriction, containing exactly the same exception for "an emergency medical condition," and concluded that the literal terms of the restriction barred prenatal care. Lewis V, 965 F.2d at 1214-15.
 
 
 71
 Nevertheless, we declined to give the prior restriction a literal interpretation because of substantial doubt, revealed in the legislative history, that Congress understood the restriction to extend to the unique circumstances of prenatal care. Id. at 1215. By contrast, the legislative history of the Welfare Reform Act leaves no doubt that Congress intended its alienage restriction to apply to prenatal care. The House Conference Report expressly states that "the conferees do not intend that emergency medical services include pre-natal or delivery care assistance that is not strictly of an emergency nature as specified herein." H.R. Conf. Rep. No. 104-725, at 380, reprinted in 1996 U.S.C.C.A.N. at 2768.[22] The legislative history confirms what the text clearly states: with a few narrow exceptions that do not encompass prenatal care, Congress intended to deny all federally funded medical assistance to unqualified aliens.
 
 
 72
 The Plaintiffs' argument stresses legislative purpose. It is undisputed, they reason, that prenatal care on balance saves money. And there is no doubt that, as with many ofits predecessor statutes, one of the principal purposes of the Welfare Reform Act was to reduce federal spending. See H.R. Rep. No. 104-651, at 9-10, reprinted in 1996 U.S.C.C.A.N. 2183, 2190-91. However, even if we were inclined to regard this as the only purpose of the Welfare Reform Act (and it is not),[23] we cannot ignore clear text and clear intent on a specific topic to achieve a more general congressional purpose. See Hashim v. INS, 936 F.2d 711, 712-13 (2d Cir. 1991) (unambiguous statutory language can only be displaced by clear legislative intent, and even then only in rare cases).
 
 
 73
 The Plaintiffs ask us to employ the canon of statutory interpretation requiring a narrow construction of a statute to avoid constitutional doubt, and argue that a narrow construction preserving coverage of prenatal care is available. It is still the case, the argument continues, that section 1396d(n)(1) defines a (mandatorily) eligible "qualified pregnant woman" to include a woman who would meet the financial and resource requirements of the former AFDC program if her unborn fetus were born.[24] A woman is eligible for AFDC if her child is eligible, and the alienage eligibility restrictions in the AFDC statute, which apply only to the child, are inapposite since an alien mother's child born in this country is a United States citizen. Therefore, the Plaintiffs' argument concludes, even an illegal alien mother should be entitled to receive prenatal care as a "qualified pregnant woman" under section 1396d(n)(1).
 
 
 74
 The reading suggested by the Plaintiffs is untenable. Their arguments might be valid if the Medicaid statute regarded the unborn fetus as itself eligible for medical assistance. However, section 1396d(n)(1) instead considers the pregnant mother to be the recipient of prenatal care for the benefit of the fetus, and determines eligibility with respect to the alien mother and not her constructively born citizen child. Section 1396d(n)(1) is therefore clearly trumped by the new alienage restrictions, which deny eligibility to "an alien who is not a qualified alien" "notwithstanding any other provision of law." See 8 U.S.C.A. 1611 (a). Section 1611(a) denies eligibility to the pregnant woman "notwithstanding" section 1396d(n)(1), which might otherwise be read to give her eligibility. Because the statute is clear, the canon of narrow construction to avoid constitutional doubt does not apply. Miller v. French, 530 U.S. 327, 341, 147 L. Ed. 2d 326, 120 S. Ct. 2246 (2000).
 
 
 75
 The Plaintiffs also argue that there is no real difference between the statutory scheme now before us and the scheme we considered in Lewis V, and that the analysis of Lewis V should therefore prevail. This ignores the rationale of Lewis V, where we were convinced by the legislative history that Congress "did not realize" that the blanket alienage restriction in OBRA '86 would operate to deny illegal alien pregnant women prenatal care. Lewis V, 965 F.2d at 1216. The Welfare Reform Act reveals precisely what OBRA '86 lacked: a clear indication that Congress was aware of the consequences of a literal reading of its blanket alienage restriction to preclude prenatal care.[25]
 
 
 76
 Because we interpret the statute to evince a clear congressional intent to deny federally-sponsored prenatal care to unqualified aliens, we must turn to the plaintiff class's claim that the Welfare Reform Act's alienage restrictions are unconstitutional as applied to prenatal care.
 
 
 77
 III. Plaintiffs' Constitutional Challenges to Denial of Prenatal Care
 
 
 78
 The Plaintiffs make two constitutional challenges to the denial of prenatal care. First, they contend that the statute is unconstitutional as applied to themselves, i.e., unqualified alien pregnant women. Second, they contend that the statute is unconstitutional as applied to the children of unqualified aliens, who automatically become citizens upon birth.
 
 
 79
 A. Constitutionality as Applied to the Plaintiffs
 
 1. Level of Scrutiny
 
 80
 The Plaintiffs acknowledge that, to the extent that they are asserting harm to themselves, rational basis is the appropriate level of scrutiny of the constitutionality of the denial of Medicaid assistance for prenatal care. That is the indisputable teaching of Mathews v. Diaz, 426 U.S. 67, 79-80, 48 L. Ed. 2d 478, 96 S. Ct. 1883 (1976), upholding the Government's "broad power over naturalization and immigration," and Reno v. Flores, 507 U.S. 292, 306, 123 L. Ed. 2d 1, 113 S. Ct. 1439 (1993), clarifying that rational basis scrutiny applies to immigration and naturalization regulation. "Responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches." Diaz, 426 U.S. at 81. Congress can therefore validly enact laws for aliens that "would be unacceptable if applied to citizens." Id. at 80. We have recently recognized that a "highly deferential" standard is appropriate in matters of immigration. Lake v. Reno, 226 F.3d 141, 148 (2d Cir. 2000).
 
 
 81
 Where rational basis scrutiny applies, the Government "has no obligation to produce evidence," or "'empirical data'" to "sustain the rationality of a statutory classification," Heller v. Doe, 509 U.S. 312, 320, 125 L. Ed. 2d 257, 113 S. Ct. 2637 (1993) (quoting FCC v. Beach Communications, Inc., 508 U.S. 307, 315, 124 L. Ed. 2d 211, 113 S. Ct. 2096 (1993)), and instead can base its statutes on "rational speculation," id. (internal quotation marks omitted). "'Any reasonably conceivable state of facts'" will suffice to satisfy rational basis scrutiny. Id. (quoting Beach Communications, 508 U.S. at 313). The burden falls to the party attacking the statute as unconstitutional to "negative every conceivable basis which might support it." Madden v. Kentucky, 309 U.S. 83, 88, 84 L. Ed. 590, 60 S. Ct. 406 (1940). There need only be a "rational relationship between the disparity of treatment and some legitimate governmental purpose." Heller, 509 U.S. at 320.
 
 
 82
 Nevertheless, the Plaintiffs contend, a heightened level of scrutiny is appropriate to the extent that the Plaintiffs are asserting the harm to the children they will bear. In this part of their argument, the Plaintiffs are not asserting the rights of their children; that contention is one we consider in Part III(B), infra. Instead, the claim is the closely related but conceptually distinct one that the level of scrutiny appropriate for the Plaintiffs' own claim is heightened because of the harm to their children. The argument purports to find support in Weinberger v. Wiesenfeld, 420 U.S. 636, 43 L. Ed. 2d 514, 95 S. Ct. 1225 (1975), but that decision does not provide what the Plaintiffs claim.
 
 
 83
 In Wiesenfeld, a widower challenged a provision of the Social Security Act that limited survivor benefits to his children. He claimed a denial of equal protection because a surviving widow was entitled to benefits for herself as well as her children. The Court upheld his claim, ruling that the statute reflected a gender-based discrimination "'premised on overbroad generalizations that could not be tolerated under the Constitution.'" Id. at 643 (quoting Schlesinger v. Ballard, 419 U.S. 498, 507, 42 L. Ed. 2d 610, 95 S. Ct. 572 (1975)). Although the Court accepted that "men are more likely than women to be the primary supporters of their spouses and children," 420 U.S. at 645, it condemned "the denigration of the efforts of women who do work and whose earnings contribute significantly to their families[]," id. The widower prevailed on his gender-based discrimination claim because of the gender-based discriminatory effect the survivor provision had on a female wage-earner. The Court noted that a purpose of the statute was to "enable the surviving parent to remain at home to care for a child," id. at 651, but the rationale for heightened scrutiny was gender-based discrimination on female wage-earners, not hardship to their surviving children, as the Plaintiffs in the pending case assert. Indeed, as Wiesenfeld makes clear, id. at 642-43, its rationale derives directly from Frontiero v. Richardson, 411 U.S. 677, 36 L. Ed. 2d 583, 93 S. Ct. 1764 (1973), which involved a gender-based discrimination against female members of the armed services (with respect to allowances for medical benefits and quarters) that had nothing whatever to do with dependent children.[26]
 
 2. Applying Rational Basis Scrutiny
 
 84
 Although no court of appeals has yet considered the Welfare Reform Act's denial of prenatal care to unqualified aliens, every court of appeals to consider the Act's deprivation of other government benefits to unqualified aliens has found the denial to survive rational basis scrutiny. See Aleman v. Glickman, 217 F.3d 1191, 1201-04 (9th Cir. 2000) (denial of food stamps to certain divorced aliens); City of Chicago v. Shalala, 189 F.3d 598, 605-09 (7th Cir. 1999) (denial of food stamps, supplemental security income, and other public benefits); Rodriguez v. United States, 169 F.3d 1342, 1350-53 (11th Cir. 1999) (denial of food stamps and supplemental security income); see also Kiev v. Glickman, 991 F. Supp. 1090 (D. Minn. 1998); Abreu v. Callahan, 971 F. Supp. 799 (S.D.N.Y. 1997).
 
 
 85
 The Secretary offers three rationales for the denial of prenatal care to unqualified alien pregnant mothers: deterrence of illegal immigration, self-sufficiency, and cost savings. The first alone suffices for rational basis review.
 
 
 86
 Congress explicitly identified as a purpose of the Welfare Reform Act "removing the incentive for illegal immigration provided by the availability of public benefits." 8 U.S.C.A. 1601 (6). Although the record discloses no evidence that a prospective illegal immigrant considers the unavailability of prenatal care in deliberating whether to illegally enter the country, such evidence is not required to satisfy rational basis analysis. Heller, 509 U.S. at 320. It is sufficient that this proposition be "reasonably conceivable," Beach Communications, 508 U.S. at 313, and it is reasonable for Congress to believe that some aliens would be less likely to hazard the trip to this country if they understood that they would not receive government benefits upon arrival, see Graham v. Richardson, 403 U.S. 365, 379, 29 L. Ed. 2d 534, 91 S. Ct. 1848 (1971) (state statutes that deny welfare benefits to aliens who have not resided in a state for a specified number of years "necessarily operate . . . to discourage entry into or continued residency in the State"); accord City of Chicago, 189 F.3d at 607. Although it seems likely that many alien women will illegally immigrate to obtain the benefit of citizenship for their children, undeterred by ineligibility for prenatal care in the event of pregnancy, Congress is entitled to suppose that the denial of care will deter some of them. In the realm of immigration, where congressional discretion is extremely broad, this supposition, even if dubious, satisfies rational basis review.[27]
 
 
 87
 B. Constitutionality as Applied to the Children
 
 1. Standing
 
 88
 Turning to the Plaintiffs' constitutional claim on behalf of their children, we first consider whether members of the plaintiff class have standing to invoke the third-party rights of their children. We conclude that they do.
 
 
 89
 The determination whether a plaintiff has standing to assert the rights of third parties has constitutional and prudential components. Singleton v. Wulff, 428 U.S. 106, 112, 49 L. Ed. 2d 826, 96 S. Ct. 2868 (1976). First, as is the case with any plaintiff, she must meet the constitutional prerequisites of standing: (1) injury-in-fact, (2) causation, and (3) redressability. Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 102-03, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998) (identifying this triad as the "irreducible constitutional minimum of standing" (internal quotation marks omitted)). In addition, she must satisfy "prudential" limitations on third-party standing: (1) a "close relation with the third party" and (2) "some hindrance to the third party's ability to protect his or her own interests." Lake, 226 F.3d at 146; see Secretary of State v. Joseph H. Munson Co., 467 U.S. 947, 956, 81 L. Ed. 2d 786, 104 S. Ct. 2839 (1984).
 
 
 90
 The Plaintiffs have demonstrated both constitutional and prudential standing. In the absence of the challenged injunction, pregnant alien women would be forced to bear the expense of prenatal care themselves, as well as the sizable costs of treating postnatal illness caused (or exacerbated) by deficient prenatal care. These women, who have to demonstrate financial hardship to meet Medicaid eligibility standards, are "injured in fact" by the denial of federally-sponsored government aid. See Doe v. Blum, 729 F.2d 186, 189 (2d Cir. 1984) (suggesting that an individual has standing to sue for denial of Medicaid coverage if she "alleges that she requested and was denied" Medicaid-sponsored care); Hazard v. Shalala, 44 F.3d 399, 403 (6th Cir. 1995) (recipient of Medicaid-sponsored care has standing to challenge provision that bars him from receiving Medicaid).
 
 
 91
 As for prudential standing, the relationship between parent and child is obviously close. See Lake, 226 F.3d at 147 (child may raise equal protection rights of deceased parent); see also Miller v. Albright, 523 U.S. 420, 433, 140 L. Ed. 2d 575, 118 S. Ct. 1428 (1998) (Stevens, J., with whom Rehnquist, C.J., joins) (child may raise equal protection rights of parent who cannot bring own claim); id. at 447 (O'Connor, J., with whom Kennedy, J., joins, concurring) ("It seems clear that petitioner has . . . a close relationship with her father" for purposes of third-party standing); id. at 473 (Breyer, J., with whom Souter and Ginsburg, JJ., join, dissenting) (child has a "close" relationship with her father for purposes of standing). And there are probably few individuals less able to protect their own interests than newborn children, many of whom in this case start life with severe mental and physical disabilities due to the denial of prenatal care. See Smith v. Organization of Foster Families, 431 U.S. 816, 841 n.44, 53 L. Ed. 2d 14, 97 S. Ct. 2094 (1977) (parents have prudential standing to raise third party claims of foster children because "children usually lack the capacity" to make litigation decisions).[28]
 
 2. The Merits of the Children's Claim
 
 92
 In asserting a claim on behalf of the children at and after birth, the Plaintiffs do not contend that a fetus, in the womb of a pregnant unqualified alien, has been subjected to unconstitutional discrimination by the denial of prenatal care that would be available for the fetus of a financially eligible pregnant citizen. Such a claim would be foreclosed by the Supreme Court's decision in Roe v. Wade, 410 U.S. 113, 35 L. Ed. 2d 147, 93 S. Ct. 705 (1973), which ruled that the fetus in utero is not a "person" within the meaning of the Fourteenth Amendment, id. at 157-59. Lacking the status of a Fourteenth Amendment "person," a fetus cannot validly claim a denial of equal protection, see Abele v. Markle, 351 F. Supp. 224, 228-29 (D. Conn. 1972) ("It is difficult to imagine how a statute permitting abortion could be constitutional if the fetus had fourteenth amendment rights."), vacated on other grounds, 410 U.S. 951 (1973) (remanding for reconsideration in light of Roe v. Wade and Doe v. Bolton, 410 U.S. 179, 35 L. Ed. 2d 201, 93 S. Ct. 739 (1973)), and there is no basis for contending that such a claim fares any better under the equal protection component of the Fifth Amendment.[29]
 
 
 93
 Instead, the Plaintiffs contend that the born child, who indisputably is a citizen entitled to equal protection of the laws, can challenge the constitutionality of the denial of prenatal care. This appears to be the premise of the District Court's constitutional ruling in this case. See Lewis VI, 111 F. Supp. 2d at 179.
 
 
 94
 In our view, recognition of a newborn child's constitutional challenge to the prior denial of care in utero is foreclosed by Roe v. Wade just as clearly as would be a constitutional claim asserted on behalf of a fetus. If, as Roe v. Wade instructs, a fetus lacks constitutional protection to assure it an opportunity to be born, we see no basis for according it constitutional protection to assure it enhanced prospects of good health after birth.
 
 
 95
 We recognize, of course, that the child suffers after birth from lack of prenatal care in the womb. And there can be no doubt that legislation may create for the child a cause of action to obtain compensation for the consequences of prenatal injury. See Humes v. Clinton, 246 Kan. 590, 594, 792 P.2d 1032 (1990) ("A majority of states allow an action for wrongful death of a viable fetus even when it is stillborn as a result of the prenatal injuries."). But a legislative benefit does not imply a constitutional requirement. Roe's preclusion of a Fourteenth Amendment right for a fetus would evaporate if a child could assert a constitutional claim for prebirth injury.
 
 
 96
 A claim asserted by a person for harm sustained in a previous status rarely if ever arises in an equal protection context, due most likely to the fact that, as a general matter, only immutable characteristics are entitled to heightened protection under the Equal Protection Clause. See Lyng v. Castillo, 477 U.S. 635, 638, 91 L. Ed. 2d 527, 106 S. Ct. 2727 (1986) ("close relatives" not a "suspect" or "quasi-suspect" class because "they do not exhibit obvious, immutable, or distinguishing characteristics that define them as a discrete group"); Frontiero v. Richardson, 411 U.S. 677, 686, 36 L. Ed. 2d 583, 93 S. Ct. 1764 (1973) (classification on the basis of sex accorded heightened scrutiny because "sex, like race and national origin, is an immutable characteristic"). Such a "transitional" equal protection claim might conceivably be asserted by an alien who later becomes a citizen, but it would not succeed. In Fiallo v. Bell, 430 U.S. 787, 52 L. Ed. 2d 50, 97 S. Ct. 1473 (1977), the Supreme Court held that the federal government need demonstrate only a rational basis for denying the illegitimate alien child of a citizen father a special immigration preference available to a similarly situated illegitimate alien child of a citizen mother.[30] We have no doubt that if the disadvantaged alien child in Fiallo later became a citizen, he could not obtain heightened scrutiny of the statutory discrimination that had denied him an immigration preference simply because he continued to suffer the consequences of the discriminatory denial that had occurred while he was an alien.
 
 
 97
 The Plaintiffs claim that Crumpton v. Gates, 947 F.2d 1418 (9th Cir. 1991), supports their position. The plaintiff in Crumpton was a six-year-old boy who alleged that his father had been killed by unconstitutional government conduct while the plaintiff was in utero. The Ninth Circuit held that the plaintiff had a valid claim for violation of a Fourteenth Amendment "substantive due process liberty interest in having familial relations with a parent." Id. at 1422.Distinguishing cases rejecting constitutional claims on behalf of a child suffering a prebirth injury, see Harman v. Daniels, 525 F. Supp. 798 (W.D. Va. 1981); Ruiz Romero v. Gonzalez Caraballo, 681 F. Supp. 123 (D.P.R. 1988), the Court ruled that "because a child has familial relationships only after birth, it follows that the child's right to familial relationships exists only after birth." Crumpton, 947 F.2d at 1422.
 
 
 98
 Whether or not we would adhere to Crumpton, we see no conflict between that decision and our rejection of the Plaintiffs' constitutional claim on behalf of their children. In Crumpton, the child was permitted to sue for the deprivation--loss of a child-parent relationship--that was suffered only upon birth. Here, however, the alleged deprivation--a discriminatory denial of Medicaid assistance on the basis of alienage--was suffered while the fetus was in utero. At that moment the fetus had no constitutional right to equal protection, and the born child's subsequent protection by the Equal Protection Clause cannot retroactively create a claim that was not cognizable before birth.
 
 
 99
 In upholding the Plaintiffs' equal protection claim on behalf of their children, the District Court in this case relied on the many decisions that have ruled unconstitutional legal disabilities or limitations of various kinds imposed because the children were illegitimate. Lewis VI, 111 F. Supp. 2d at 176-77 (collecting cases). In all such cases, the plaintiff child challenged governmental action that was currently imposing some restriction. E.g., Clark v. Jeter, 486 U.S. 456, 100 L. Ed. 2d 465, 108 S. Ct. 1910 (1988) (six-year statute of limitations on paternity suit by illegitimate child); Trimble v. Gordon, 430 U.S. 762, 52 L. Ed. 2d 31, 97 S. Ct. 1459 (1977) (law allowing illegitimate child to inherit by intestate succession from mother, but not father); Jimenez v. Weinberger, 417 U.S. 628, 41 L. Ed. 2d 363, 94 S. Ct. 2496 (1974) (Social Security Act provision imposing restrictions on illegitimate child's recovery of benefit upon disability of parent). By contrast, the challenged denial of prenatal care occurred before the Plaintiffs' children were born. After their birth, no governmental action was taken against them, except for the denial of automatic eligibility for Medicaid coverage at birth, a matter to which we now turn.
 
 
 100
 IV. Plaintiffs' Constitutional Challenge to Denial of Children's Automatic Eligibility
 
 
 101
 The newborn child's lack of a valid equal protection claim to assure Medicaid assistance for prenatal care in utero does not mean that the entire claim advanced by the Plaintiffs on their children's behalf is without merit. What remains for consideration is the citizen child's claim to Medicaid coverage from the moment of birth, so-called "automatic eligibility."
 
 A. The Statutory Scheme
 
 102
 The "automatic eligibility" provision of the Medicaid statute was added in DRA '84. This provision ensures that a newborn child of a mother receiving Medicaid is automatically eligible for Medicaid-sponsored care at birth:
 
 
 103
 A child born to a woman eligible for and receiving medical assistance under a State plan on the date of the child's birth shall be deemed to have applied for medical assistance and to have been found eligible for such assistance under such plan on the date of such birth and to remain eligible for such assistance for a period of one year so long as the child is a member of the woman's household and the woman remains (or would remain if pregnant) eligible for such assistance. During the period in which a child is deemed under the preceding sentence to be eligible for medical assistance, the medical assistance eligibility identification number of the mother shall also serve as the identification number of the child, and all claims shall be submitted and paid under such number (unless the State issues a separate identification number for the child before such period expires).
 
 
 104
 42 U.S.C.A. 1396a (e)(4); see also 42 C.F.R. 435.117, 435.301(b)(1)(iii).[31] This automatic eligibility is important because it assures immediate care, unfettered by paperwork and bureaucratic hurdles, at a critical time in the child's life.
 
 
 105
 Because the Welfare Reform Act denies prenatal Medicaid assistance to an unqualified alien, she cannot meet section 1396a(e)(4)'s requirement of "receiving medical assistance under a State plan on the date of the child's birth," and her newborn child therefore does not qualify for a year of automatic Medicaid coverage under the literal terms of section 1396a(e)(4). A citizen child of an unqualified alien mother is thus disadvantaged compared to a citizen child of a citizen mother. The latter will receive automatic Medicaid coverage at birth if his or her mother, prior to birth, has qualified for Medicaid for herself.
 
 
 106
 The Secretary initially opposes the Plaintiffs' claim for automatic eligibility on the ground that there is no discrimination at all: every child born of a parent who is not then on Medicaid must file for Medicaid coverage and demonstrate entitlement as a child. See Brief for Appellants at 29. This argument calls to mind Anatole France's view of the equality that forbids rich and poor alike to sleep under bridges.[32] Although all alien and citizen mothers are equally prevented from obtaining automatic coverage for their children at birth in the absence of their own Medicaid coverage during pregnancy, only the children of the plaintiff class members have been denied automatic eligibility at birth because their mothers were prohibited by the Act's alienage provisions from obtaining Medicaid coverage during pregnancy.
 
 
 107
 The Secretary also endeavors to minimize the significance of the distinction between the citizen children of alien mothers and the citizen children of citizen mothers by pointing to the opportunity to obtain coverage after birth. If the child is eligible for Medicaid in the child's own right, the alien mother can sign the child up for Medicaid after the birth, and can obtain retroactive coverage to the date of birth, because Medicaid coverage is retroactive for three months from the date of application. 42 C.F.R. 435.914.
 
 
 108
 We agree with the Plaintiffs, however, that the citizen children of alien mothers remain disadvantaged by the lack of automatic eligibility. In the first place, although retroactive coverage eases the financial problem of not being able to pay for medical services that are obtained, it does not solve the medical problem of not receiving immediate medical services for the child from providers who insist on proof of current Medicaid coverage. Moreover, automatic coverage at birth is obviously preferable to having to apply in the weeks immediately after childbirth and enduring bureaucratic delays. Finally, many mothers, particularly those who recently arrived from another country, will not necessarily know that their children are likely eligible for postnatal care, and it is well documented that many do not receive accurate or sufficient eligibility information from practitioners and social workers. See Dennis Andrulis et al., Voices for Children's Health in New York State: Community Roundtables on Increasing Medicaid and Child Health Plus Enrollment, New York Forum for Child Health, available at http://www.nyam.org/publications/online/childinsurance/voices.html (visited April 11, 2001).
 
 
 109
 B. Lawfulness of Denying Automatic Eligibility
 
 
 110
 The Plaintiffs' claim for automatic eligibility for citizen children of alien mothers can be considered as a request for either a favorable interpretation of the Medicaid statute to preclude denial of automatic eligibility, or, if the statute is thought to require such denial, invalidation of the denial on equal protection grounds. The alternate approaches are related because the substantiality of the constitutional objection would weigh in favor of a favorable statutory interpretation that would avoid any constitutional issue. We consider both approaches.
 
 1. Statutory Interpretation
 
 111
 Section 1396a(e)(4) does not by its terms include within its coverage the citizen child of an alien mother. But neither this provision, nor any other provision of the Welfare Reform Act, appears designed to make sure that these citizen children will be denied the same automatic eligibility accorded children of eligible citizen mothers. Moreover, there is no indication of congressional intent to deny these citizen children such automatic eligibility, comparable to the clearly expressed intention, which we have recognized, to deny Medicaid assistance for prenatal care to alien women.
 
 
 112
 Thus, the circumstances present a compelling case for interpreting the Medicaid statute as favorably for citizen children as we did in Lewis V for pregnant alien women seeking prenatal care. First, the mechanics of automatic eligibility for newborn children of eligible citizen mothers is obscured by the density of the Medicaid statute, and it is highly unlikely that Congress in 1996 was focusing on this aspect of the statute at all, much less intending to take the unusual step of denying such eligibility to citizen children because of the alienage of their mothers. Moreover, as we next discuss, reading the statute to preclude such eligibility encounters substantial constitutional objection. Nevertheless, we conclude that we cannot "interpret" the Act to permit automatic Medicaid coverage at birth for citizen children of alien mothers denied Medicaid because of alienage. In Lewis V, we declined a literal reading of the Act mainly to carry out the congressional purpose of saving money. With the passage of the Welfare Reform Act and its alienage provisions, we now know that Congress is willing to risk incurring the added costs of treating children denied prenatal care because of the alienage of their mothers, doing so in the hope of deterring unlawful immigration. We would not be furthering a congressional cost-saving objective, as in Lewis V, by "interpreting" the Medicaid statute to accord the Plaintiffs' children automatic Medicaid eligibility.
 
 2. Constitutional Objection
 
 113
 Viewed as an equal protection issue, the Plaintiffs' claim on behalf of their children is persuasive. Initially, we note that a disadvantage need not be especially onerous to merit assessment under the Equal Protection Clause. In Miller, the Supreme Court considered a provision that grants automatic citizenship at birth to the child of an alien father and a citizen mother, but, in the case of the child of an alien mother and a citizen father, requires either the child or the father to take any of several steps to confirm their relationship before the age of 18, 8 U.S.C. 1409. One of the steps was obtaining the father's acknowledgment under oath of his paternity, id. 1409(a)(4)(B). The Court considered this discriminatory treatment sufficient to trigger assessment under the Equal Protection Clause. Miller, 523 U.S. at 433-41. As we noted in Comer v. Cisneros, 37 F.3d 775 (2d Cir. 1994), the "government harms minority individuals, and violates the Equal Protection Clause . . . 'when the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group.'" Id. at 793 (quoting Northeastern Fla. Chapter of Associated Gen. Contractors v. City of Jacksonville, 508 U.S. 656, 666, 124 L. Ed. 2d 586, 113 S. Ct. 2297 (1993)).
 
 
 114
 If the denial of automatic eligibility for the citizen children is assessed under the rational basis standard, this might be the rare case where the equal protection claim would prevail. Although the denial is based on the alienage of the mother, the "highly deferential" standard appropriate in matters of immigration, see Lake, 226 F.3d at 148, is not applicable here because we are concerned with a claim asserted on behalf of a citizen.[33] As we recognized in Lake, "Fiallo itself made clear that the reduced threshold of justification for governmental action that applied to immigrants did not apply to citizens." Lake, 226 F.3d at 148.[34] On a traditional rational basis inquiry, the denial of automatic eligibility would encounter substantial objection. Although it is arguably rational to think that some pregnantwomen will be deterred from crossing our borders by the unavailability of welfare benefits (despite the certainty of citizenship for their children), the limits of "rational speculation," Heller, 509 U.S. at 320 (internal quotation marks omitted), are surely approached by thinking that they are deterred by the disadvantage of obtaining for their children automatically the coverage that they can obtain by application. On this point, the Secretary's suggestion that the disadvantage is slight substantially undermines whatever argument might be made that the lack of automatic eligibility rationally serves to deter immigration. However, we need not decide whether the denial of automatic eligibility for the children because of their mother's alienage would survive traditional rational basis scrutiny, because, under Plyler, it fails to survive heightened scrutiny.
 
 
 115
 In Plyler, 457 U.S. at 220, the Supreme Court invalidated a Texas statute denying public schooling to the children of illegal aliens because the denial "directed the onus of a parent's misconduct against his children." Plyler concluded that such a statute "can hardly be considered rational unless it furthers some substantial goal of the State," id. at 224, a test the Court recognized as consistent with intermediate scrutiny, see id. at 218 n.16, 224.
 
 
 116
 The Plaintiffs contend that the heightened scrutiny applied in Plyler is appropriate here because the discriminatory denial of automatic eligibility, although not based on gender or race, is imposed on the citizen children solely because of the unqualified alien status of their mothers. The Secretary responds that Fiallo precludes the application of heightened scrutiny under Plyler. However, we have already held in Lake, drawing an inference from the various opinions of the Justices in Miller, that citizen claimants with an equal protection claim deserving of heightened scrutiny do not lose that favorable form of review simply because the case arises in the context of immigration. Lake, 226 F.3d at 145-46, 147-48. Admittedly, the circumstances in Plyler, which the Court has never since invoked to invalidate a statute, presented a more compelling case for heightened scrutiny than does the Plaintiffs' claim for automatic eligibility, because the denial there--public education--is more burdensome than the brief postponement of obtaining Medicaid coverage (serious as that might be in some circumstances). On the other hand, the Plaintiffs' claim is stronger in that here it is asserted on behalf of citizen children, whereas the claimants in Plyler were alien children. Although the Supreme Court has noted that it has not extended Plyler beyond its "'unique circumstances,'" Kadrmas v. Dickinson Public Schools, 487 U.S. 450, 459, 101 L. Ed. 2d 399, 108 S. Ct. 2481 (1988) (quoting Plyler, 457 U.S. at 239 (Powell, J., concurring)), the Court has identified those circumstances as (a) penalizing children for the illegal conduct of their parents and (b) risking significant and enduring adverse consequences to the children, id. The first circumstance fully applies to the denial of automatic eligibility to citizen children solely because of their alien mothers' unlawful status, and the second circumstance may be expected to apply to many of these children. See, e.g., Judy C. Bernbaum, Medical Care after Discharge, in Neonatology: Patholophysiology and Management of the Newborn 1355 (Gordon B. Avery et al. eds., 4th ed. 1993) (emphasizing importance of monitoring high-risk and low-birth-weight children shortly after birth to prevent and treat life-threatening diseases).[35] Moreover, the claim on behalf of the children, like the alien children's claim in Plyler, is that a social welfare benefit, itself unrelated to immigration, has been denied on a discriminatory basis that violates the Equal Protection Clause.
 
 
 117
 We therefore conclude that the citizen children of the plaintiff class must be accorded automatic eligibility on terms as favorable as those available to the children of citizen mothers. We will leave it to the District Court on remand to develop, after consultation with the parties, a revised injunction that assures the plaintiff class the same automatic eligibility for their citizen children that is available to the children of citizen mothers. Because the alien mother, unlike the citizen mother, cannot obtain Medicaid coverage for herself prior to giving birth, it seems likely that the Secretary will have to adopt some procedure permitting the alien mother, during her pregnancy, to apply for and obtain a Medicaid number for her child that is automatically effective upon the child's birth, assuming financial eligibility requirements are met.
 
 Conclusion
 
 118
 The order is reversed to the extent that it continues the injunction requiring the Secretary to provide prenatal Medicaid assistance to the plaintiff class, affirmed to the extent that it requires the Secretary to make automatic eligibility for Medicaid coverage available to the citizen children of the plaintiff class upon their birth, on terms as favorable as those available to the children of citizen mothers, and remanded for entry of a modified injunction consistent with this opinion. No costs.
 
 
 
 Notes:
 
 
 [1]
 The Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("Welfare Reform Act" or "Act"), Pub. L. No. 104-193, 400-451, 110 Stat. 2105, 2261-76, codified as amended at 8 U.S.C.A. 1601-66 (West 1999 & Supp. 2000).
 
 
 [2]
 Lewis V is labeled "Lewis IV-A" in the District Court decision now on appeal, which we label "Lewis VI."
 
 
 [3]
 U.S.C.A. cites have been used throughout for convenience.
 
 
 [4]
 These individuals are also known as "Ribicoff children," see, e.g., H.R. Conf. Rep. No. 98-861, at 1359, reprinted in 1984 U.S.C.C.A.N. 1445, 2047, so named after Senator Abraham Ribicoff, who was instrumental in assuring their inclusion in Medicaid coverage, see Hearings on Health Coverage for Families Leaving Welfare Before the Subcomm. on Human Resources of the House Comm.on Ways and Means, 106th Cong. (2000) (statement of Jean Hearne, Specialist in Social Legislation, Congressional Research Service, Library of Congress), available at 2000 WL 19303668.
 
 
 [5]
 AFDC keyed eligibility to the need of a "dependent child" rather than the need of the mother. 42 U.S.C.A. 605, 606(a), repealed by Pub. L. No. 104-193, 103(a)(1), 110 Stat. 2112 (1996). This presented a potential problem for determining eligibility for prenatal care because the fetus in need of care was unborn; nevertheless, for decades the Department of Health, Education and Welfare (HEW), predecessor to HHS, regarded a fetus as eligible under the Act. The Supreme Court held in Burns v. Alcala, 420 U.S. 575, 584-86, 43 L. Ed. 2d 469, 95 S. Ct. 1180 (1975), that participating states were not required to offer prenatal care, but left open the possibility that states were nonetheless permitted to offer such care under the Plan, and that remained the Department's interpretation for some time.
 
 
 [6]
 Medicare, which provides medical assistance to the aged and disabled without regard to financial status, was passed at the same time as Medicaid, and contained an explicit restriction on alien eligibility. Social Security Amendments of 1965, Pub. L. No. 89-97, 1836, 79 Stat. 286, 304 (1965).
 
 
 [7]
 At some point before 1986, the Secretary replaced the alienage regulation with the following provision:
 The agency must provide Medicaid to otherwise eligible residents of the United States who are -
 (a) Citizens; or
 (b) Aliens lawfully admitted for permanent residence or permanently residing in the United States under color of law ["PRUCOL aliens"] . . . .
 Lewis V, 965 F.2d at 1212 (quoting 42 C.F.R. 435.402 (1992)). Although not on its face excluding reimbursement for state plans that covered non-PRUCOL aliens, the regulation was interpreted that way by the Secretary. Id.
 
 
 [8]
 The class has since been amended to include "all aliens residing in New York State who have applied or attempted to apply for Medicaid but have been or would be denied on the basis of their alienage." Lewis VI, 111 F. Supp. 2d at 147 n.7 (internal quotation marks omitted).
 
 
 [9]
 Congress also added an alienage restriction to AFDC in OBRA '81, but did not add a similar restriction to the Medicaid statute. OBRA '81, 2320.
 
 
 [10]
 The legislative history makes it clear that Congress was reacting specifically to Judge Sifton's ruling. See H.R. Rep. No. 99-727, at 111 (1986), reprinted in 1986 U.S.C.C.A.N. 3607, 3701:
 On July 14, 1986, a U.S. District Court struck down [the Medicaid alienage restriction] regulation as outside the scope of the authority delegated under the Medicaid statute. . . .
 In response to the Court's invitation to clarify Congressional intent, the Committee bill amends the Medicaid statute to make it explicit that Federal financial participation is not available for State expenditures for aliens who are not lawfully admitted for permanent residence or permanently residing in the U.S. under color of law.
 
 
 [11]
 However, Congress expressed a desire to give PRUCOL an expansive meaning in this context:
 The Committee intends that the Secretary and the States broadly interpret the phrase "under color of law" to include all of the categories recognized by immigration law, policy, and practice in effect at the time. . . .
 H.R. Rep. No. 99-727, at 111, reprinted in 1986 U.S.C.C.A.N. at 3701.
 
 
 [12]
 The statute provided:
 (v)(1) Except as provided in paragraph (2), no payment may be made to a State under this section for medical assistance furnished to an alien who is not lawfully admitted for permanent residence or otherwise permanently residing in the United States under color of law.
 (2) Payment shall be made under this section for care and services that are furnished to an alien described in paragraph (1) only if--
 (A) such care and services are necessary for the treatment of an emergency medical condition of the alien, and
 (B) such alien otherwise meets the eligibility requirements for medical assistance under the State plan approved under this title (other than the requirement of the receipt of aid or assistance under title IV, supplemental security income benefits under title XVI, or a State supplementary payment).
 OBRA '86, 9406(a).
 
 
 [13]
 Lewis II was filed after the earlier Lewis III, but we have retained the labeling of these decisions used by the District Court and this Court throughout the litigation.
 
 
 [14]
 See U.S. Const. amend. XIV, 1, cl. 1 ("All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."); 8 U.S.C.A. 1401; INS v. Rios-Pineda, 471 U.S. 444, 446, 85 L. Ed. 2d 452, 105 S. Ct. 2098 (1985).
 
 
 [15]
 An amended version of the opinion was issued on April 2, 1992.
 
 
 [16]
 This evidence took two forms. First, the legislative history of OBRA '86 reveals Congress to have been attentive only to the absence of alienage restrictions in the "optional categorically needy" and "optional medically needy" categories, apparently thinking that the alienage restriction in the AFDC statute took care of the "mandatory categorically needy" category (which is principally tied to AFDC eligibility). However, among the problems with this approach was that it ignored "qualified pregnant women," who are listed among the "mandatory categorically needy" but whose eligibility is not tied to AFDC and therefore cannot be deemed to have incorporated AFDC's alienage restrictions. Congress did not appear to have recognized this problem. We concluded that Congress was inattentive to the impact OBRA '86's alienage restrictions would have on Medicaid coverage of alien pregnant women's health needs. See Lewis V, 965 F.2d at 1216-17.
 Second, we recognized that the states' authority to provide prenatal coverage directly to the fetus as an "individual under the age of 21," had been unresolved for some time. Since the OBRA '86 alienage restriction did not appear to deal with the "under the age of 21" approach, we concluded that any attempt to impute to Congress an intent to deny prenatal care in these circumstances would be premised on the questionable assumption that Congress believed the law to have been settled against treating fetuses as "individuals under the age of 21" entitled to Medicaid assistance in their own right. Id. at 1217.
 
 
 [17]
 The statute was amended later in 1996 to except many battered spouses and their children receiving care for injuries related to the battery. Pub. L. No. 104-208, 501, 110 Stat. 3009-670, codified at 8 U.S.C.A. 1641 (c)(1)-(3).
 
 
 [18]
 The statute also allows a state to impose time limits on Medicaid eligibility (and, in some cases, deny eligibility altogether) for certain classes of qualified aliens who are not lawful permanent residents. See 8 U.S.C.A. 1612 (b).
 
 
 [19]
 Other exceptions are provided for immunizations and treatment of symptoms of communicable diseases not covered by Medicaid, see 8 U.S.C.A. 1611 (b)(1)(C), short-term disaster relief, id. 1611(b)(1)(B), certain community service programs designated by the Attorney General, including such programs as soup kitchens and crisis counseling, see id. 1611(b)(1)(D), certain housing and community development programs, see id. 1611(b)(1)(E) and federally funded School Lunch and Breakfast programs, see id. 1615. None of these exceptions is relevant to the prenatal care at issue in this case.
 
 
 [20]
 For example, an individual who, while not a permanent lawful resident, has entered and continuously resided in the United States since 1972 is considered PRUCOL, see, e.g., 42 C.F.R. 435.408(13), but such an alien would not automatically count as "qualified" under the Welfare Reform Act, and states would be prohibited from dispensing Medicaid funds to her for a non-emergency condition unless she otherwise came within the meaning of "qualified alien" in section 1641(b).
 
 
 [21]
 Unlike the "emergency medical condition" defined in section 1396b(v)(3), prenatal care encompasses for the most part regular, "routine" monitoring of the health and progress of the pregnant woman and fetus, as well as nutritional and other counseling.
 
 
 [22]
 The Plaintiffs insist that the Conference Report "does not rule out a contrary reading of the statute." Br. for Plaintiffs-Appellees at 60. They apparently mean to suggest that the Report was not focusing on the ineligibility of aliens for prenatal care, but rather on the narrow question of whether "emergency medical services" should be defined to include prenatal care. However, the definition of "emergency medical services" is important to the statutory scheme only insofar as it defines what care will continue to be available to unqualified aliens. The Report's reference to prenatal care occurs in the middle of a one-page discussion under the heading "Aliens who are not qualified aliens [are] ineligible for federal public benefits." The reference to prenatal care under this heading makes clear that the Conference Committee had aliens in mind in defining "emergency medical services" to exclude prenatal care. See id. at 379, reprinted in 1996 U.S.C.C.A.N. at 2767.
 
 
 [23]
 We note Congress's additional purposes in Part III(A)(2), infra.
 
 
 [24]
 The Welfare Reform Act ended AFDC, but still tied eligibility for Medicaid assistance to the eligibility standards of AFDC as they existed before AFDC was eliminated. See 42 U.S.C.A. 1396u-1 (West Supp. 2000).
 
 
 [25]
 Another concern that led us to look beyond the statutory text in Lewis V is also absent from this case. We noted that the provisions denying benefits to aliens were part of an "end-of-session, omnibus budget reconciliation bill" rather than an immigration law, and therefore could not be assumed to reflect the careful, focused attention of legislators on matters of immigration policy. Lewis V, 965 F.2d at 1216, 1220. By contrast, the Welfare Reform Act was the product of months of debate and extensive committee hearings in the House, and Congress articulated a clear vision of how it expected the Act to alter immigration law. See Welfare Reform Act, Pub L. 104-193, 400, codified at 8 U.S.C.A. 1601 ("The Congress makes the following statements concerning national policy with respect to welfare and immigration . . . .").
 
 
 [26]
 The Plaintiffs make a similarly unavailing argument in reliance on Califano v. Goldfarb, 430 U.S. 199, 51 L. Ed. 2d 270, 97 S. Ct. 1021 (1977), but the rationale for the heightened scrutiny in that decision was also a gender-based discrimination, not hardship to children. Id. at 204 ("The gender-based distinction drawn by 402(f)(1)(D)--burdening a widower but not a widow with the task of proving dependency upon the deceased spouse--presents an equal protection question indistinguishable from that decided in Weinberger v. Wiesenfeld." (citation omitted)).
 
 
 [27]
 Because the deterrence rationale suffices, we need not assess the Secretary's additional rationales of self-reliance, see 8 U.S.C.A. 1601 (5) ("It is a compelling government interest to enact new rules for eligibility and sponsorship agreements in order to assure that aliens be self-reliant in accordance with national immigration policy"), or saving money, see id. 1601(4) ("Current eligibility rules for public assistance . . . have proved wholly incapable of assuring that individual aliens not burden the public benefits system."). The latter rationale would seem to press the limits of even "rational speculation," Heller, 509 U.S. at 320 (internal quotations marks omitted); it requires a belief that the welfare costs that would have been spent on the alien women (and their families) who are deterred by the denial of benefits would exceed the added costs of providing extensive medical services, for the rest of their lives, to the citizen children of those who come anyway.
 
 
 [28]
 The Secretary additionally argues that the Plaintiffs cannot invoke the third-party rights of their children because they did not specifically allege those rights in the complaint. However, a plaintiff's failure to allege third-party rights in a complaint does not necessarily preclude a later assertion of those rights at summary judgment. See National Union of Hospital and Health Care Employees v. Carey, 557 F.2d 278 (2d Cir. 1977) (adjudicating plaintiffs' attempt to invoke third-party rights despite apparent absence of specific invocation of third-party rights in complaint). In this case, the Plaintiffs challenged the application to their children of the Secretary's alienage restrictions from the start of the litigation, see Lewis VI, 111 F. Supp. 2d at 148; the State of New York specifically raised the constitutional rights of the children of alien mothers when it intervened shortly after the commencement of the case, see Intervenor Complaint of City of New York at 12; the Plaintiffs have been submitting affidavits documenting the need for Medicaid funding of prenatal care since at least 1987; and we looked to the constitutional rights of these children in deciding to narrowly interpret the statute in Lewis V.
 
 
 [29]
 An equal protection claim, like the substantive due process claim in Roe v. Wade, can be asserted only by, or on behalf of, a "person" entitled to Fifth or Fourteenth Amendment protection.
 
 
 [30]
 Fiallo involved several plaintiffs, some of whom were citizens and some were aliens. The characteristics of Serge Warner are pertinent to this discussion; he was the alien child of a citizen father and had been denied, allegedly in violation of equal protection, the benefit of an immigration preference. See Fiallo, 430 U.S. at 790 n.3.
 
 
 [31]
 Section 435.117 of the regulations appears to limit automatic eligibility for the child to a mother receiving Medicaid assistance as "mandatory categorically needy"; section 435.301(b)(1)(iii) appears to provide automatic coverage to a mother receiving Medicaid assistance as "optional medically needy." The precise nature of the automatic coverage for the child of a citizen mother is not at issue on this appeal. We will consider the Plaintiffs' claim for automatic coverage for the child of an alien to seek coverage on whatever terms apply to the child of a citizen.
 
 
 [32]
 "The law, inits majestic equality, forbids the rich as well as the poor to sleep under the bridges, to beg in the streets, and to steal bread." Anatole France, Le Lys Rouge, ch. VII (1894).
 
 
 [33]
 We recognize that highly deferential rational basis scrutiny was used in Fiallo even though one of the plaintiffs, Ramon Martin Fiallo, was a citizen. See Fiallo, 430 U.S. at 790 n.3. However, the citizen plaintiff child was making no claim for himself; the claim in that case was for an immigration preference for the child's alien father, a matter unquestionably subject to Congress's broad power over immigration.
 
 
 [34]
 There is a latent ambiguity in Lake as to whether the "reduced threshold of justification for governmental action that applied to immigrants" means "reduced from ordinary rational basis review" or "reduced from the heightened scrutiny that would apply to a discrimination on the basis of gender or race."
 
 
 [35]
 See also Sue R. Broyles, et al., Comprehensive Follow-up Care and Life-Threatening Illnesses Among High-Risk Infants: A Randomized Controlled Trial, 284 J. Am. Med. Ass'n 2070 (2000) (access to comprehensive medical care during first year of life for high-risk, inner-city infants reduced incidence of life-threatening illnesses by more than 40%); Technical Working Group, World Health Organization, Postpartum Care of the Mother and Newborn: A Practical Guide, 26 Birth 255, 256 (1999) (timing of postnatal care and mother's ability to access postnatal care for infant when necessary are "crucial" to maintaining the health of the newborn).